MARINE HYDRAULICS
INTERNATIONAL,
INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Metro Machine Corporation,
Defendant–Intervenor.

No. 99–107 C.

United States Court of Federal Claims.

April 27, 1999.[1]

1. This opinion was issued under seal on March 22, 1999. Pursuant to ¶ 2 of the ordering language, the parties identified protected/privileged material subject to deletion. Brackets identify the material deleted.

 

Michael John Gardner, Virginia Beach, Virginia, for plaintiff. Michelle A. Hughes, Virginia Beach, Virginia, of counsel.

Jeffrey Alan Belkin, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, and Anthony H. Anikeeff, Assistant Director, Department of Justice, Washington, D.C., for defendant. Keith M. Dunn, Cindy Grey Effer, Robert E. Lieblich and William A. Longwell, Associate Counsel, Naval Sea Systems Command, Arlington, Virginia, of counsel.

George D. Ruttinger, Washington, D.C., for defendant-intervenor.

2. The USS CARR (FFG–52) is one of 22 FFG–7 Class guided missile fast frigate ships assigned to the Atlantic Fleet. Declaration of Capt. John R. Eckelberry, USN ("Eckelberry Decl.") ¶ 10. Its primary mission is anti-submarine warfare and

*OPINION*

HEWITT, Judge.

This matter comes before the court on a post-award bid protest. Marine Hydraulics International, Inc. ("MHI" or "plaintiff") challenges the decision of the Navy (the "Navy" or "government") to award the fixed price contract under Solicitation N62678–99–R–0058 ("the Solicitation") for the repair of the USS CARR to Metro Machine Corporation ("Metro" or "intervenor"). MHI specifically complains that the government performed a flawed analysis of MHI's past performance and an improper trade off analysis between past performance and price. Metro is a party to this litigation as defendant-intervenor.

### I. Background

On December 23, 1998, the Navy issued the Solicitation for "miscellaneous repairs and SHIPALTS" on the USS CARR (FFG–52).[2] Administrative Record ("AR") at 281. Section B–2–8 of the Solicitation required offerors to submit offers for the work described in Contract Line Identification Numbers ("CLINs") 0001 through 0012. AR at 375. The Solicitation stated that offers would be evaluated based on the total offer for all CLINs, including both the work outlined in CLINs 001, 0011, and 0012 (for which the Job Order award would initially be made) and certain other work set forth in CLINs 002 through 0010 (which might be awarded or not at the government's sole option). *Id.*

Section M–2 of the Solicitation set forth the basis for the contract award:

> The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, cost or price, and other factors specified elsewhere in this section, considered.

the conduct of maritime interdiction operations. *Id.* Moreover, it possesses the anti-air warfare capabilities which are critical to any major aircraft carrier operation. *Id.*

AR at 578. Section M–6 of the Solicitation stated that offers would be evaluated on the basis of past performance and price. *Id.* at 579–80. With respect to the relative importance of the factors, the Solicitation stated, "Past Performance is approximately equal to Price, with Past Performance being more important than Price". *Id.* at 580.

With respect to past performance, the Navy would give "greater consideration to contracts requiring the same or similar type and complexity of work required by the solicitation." AR at 579. In evaluating past performance, the Navy would consider three subfactors: (i) technical (quality of product), (ii) schedule, and (iii) management. *Id.* Section L of the Solicitation informed offerors that the Government would review "Contractor Performance Assessment Reporting System (CPARS) ratings and other existing past performance ratings on relevant contracts" to evaluate the subfactors of past performance. *Id.* at 567. Section L further informed offerors that the Navy would consider information submitted by offerors in their proposals regarding past performance of similar contracts. *Id.* at 567.[3]

The Solicitation defined the "most relevant" past work "given the type of effort involved in this solicitation" to be "*[p]revious availabilities on U.S. Navy Surface ships involving miscellaneous structural, electrical and mechanical repairs and shipalts on [sic] similar size and complexity with schedule and milestone adherence as critical and performed at a contractor's facility.*" *Id.* at 579 (emphasis in original). It added that "other

types of contracts/work not meeting the most relevant definition … may be considered … as well, if aspects of the past performance are deemed to have some bearing on the expected performance of the subject solicitation." *Id.*

In response to the Solicitation, Metro, the awardee and defendant-intervenor here, submitted a bid on January 26, 1999. Metro's price for CLINs for the Job Order award ("base price") was $1,783,658, and its total price including all options was $2,345,974. AR at 505. Metro's offer included detailed submissions on past performance. *Id.* at 485–797. Specifically, Metro highlighted its past performance on numerous ship repairs and addressed critical comments it had received during Navy debriefings following the non-award of other contracts. Metro also listed the work to be accomplished in the USS CARR specification and identified prior contracts under which Metro performed similar work. Among the ship repair contracts listed were the USS COMTE DE GRASSE, USS SCOTT, and USS YORKTOWN. *Id.* at 633–34.

MHI also submitted a proposal for the USS CARR work on January 26, 1999. AR at 798–930. The bid did not include any past performance data. MHI's base price was $1,531,142, and its total price including options was $2,340,691. *Id.* at 803.

Two other offerors submitted timely proposals as well. The lowest priced evaluated offers of the four submissions were from Metro and MHI.[4]

---

3. Section L–2–8 of the Solicitation, inviting offerors to submit past performance information of their choosing, provided as follows:

> (b) Each offeror has the opportunity to provide in its proposal any information regarding its past performance of contracts similar to the Government's requirement that it would like the Government to consider. Such information may be in the nature of:
> (1) additional information which the Government has readily available, for example, data in the CPARS system;
> (2) information which the offeror considers essential to the Government's evaluation of Section M(M–6) sub factors;
> (3) explanatory information of substandard or poor performance and the corrective actions taken to prevent a recurrence.

> The government reserves the right to determine the relevancy of such information, and to verify statements and representations made in an offeror's proposal. Any information provided must be in sufficient detail with points of contact to enable the Government to do an evaluation in accordance with the Past Performance subfactors in Section M(M–6). Summary lists of contracts or incomplete data may not be considered. AR at 567–568.

4. Evaluated price includes prices for all option work per section M–4 of the Solicitation and 52.217–5 of the Federal Acquisition Regulation ("FAR"). AR at 578. There was no determination made not to evaluate the total price. Transcript of Hearing March 18, 1999 ("3/18/99 TR") at 60–61. *See* FAR § 17.206(b).

As prescribed by the Source Selection Plan ("SSP"), the Navy's internal guidance on source selection,[5] the four member Past Performance Evaluation Team ("PPET") performed separate evaluations for each of the four offerors on each of the three subfactors of past performance. The evaluators considered the same number of ships in assessing past performance for each offeror. After conducting individual evaluations, the PPET members reached a consensus rating for each offeror and issued a PPET Report.[6]

Section II of the PPET Report set forth the separate evaluations for each of the offerors. In evaluating MHI's past performance, the PPET considered four prior ship repair jobs. As to each job, the PPET noted the type of work, the contract amount, and the duration of the work: (1) USS THORN (SRA; $3,746,754; 3 mos.); (2) USS NICHOLAS (ROH; $2,143,626; 2 mos.), (3) USS CARTER HALL (PRAV; $1,209,483; 3.5 mos.), and (4) USS BARRY (PRAV; $1,220,277; 2.75 mos.). AR at 977. The report stated that "[t]he work performed for the [listed] jobs ... is considered to be similar in nature to the work included in the subject solicitation." *Id.* The report further stated that "[t]hree of the four jobs evaluated were of smaller scale than the work package for the USS CARR," and "[o]ne job was of very similar scale." *Id.* The consensus of the PPET as to MHI's ratings for each performance subfactor was: Technical, Very Good; Schedule, Exceptional; and Management, Very Good.

The PPET Report outlined and discussed MHI's strengths and weaknesses in the technical, schedule, and management areas.[7] In summary as to MHI's past performance, the report stated:

> MHI's past performance of relevant jobs that are similar to the subject availability met contractual requirements and exceeded some to the Government's benefit. The past performance being assessed was accomplished with some minor problems for which corrective actions taken by the contractor were effective. The contractor's performance over completed contracts was consistently of high quality. The contractor received a consensus rating of Very Good. The PPET perceives a Low Risk in awarding this job to Marine Hydraulics International, Inc. The contractor's past performance record leads to a strong expectation of successful performance.

AR at 979.

The evaluation of Metro in the PPET Report also addressed four prior contracts: (1)[ ]; (2)[ ]; (3)[ ]; and (4)[ ]. AR at 979. Each of the contracts evaluated by the PPET members was a fixed price contract. *Id.* at 637–639, Figure 5–1.

As to the relevance of Metro's prior contracts, the PPET report stated that "Metro's evaluated past performance for the jobs listed above is considered to be similar to the work for the subject solicitation." AR at 979. The report added that "[o]ne job was of similar scale, one job was of smaller scale and 2 jobs were of significantly larger scale."

5. The SSP defined "the methods and procedures for selection of a contractor for the **USS CARR (FFG–52) SELECTED RESTRICTED AVAILABILITY (SRA)** under Solicitation N62678–99–R–0058." AR at 269. It established a Past Performance Evaluation Team ("PPET") to rate each offeror's past performance based on gathered information and to report the results. *Id.* at 271. It also established a Best Value Advisory Committee ("BVAC") to: (1) evaluate each offeror's past performance and price upon receipt of the PPET evaluations; (2) prepare a best value ranking; (3) document the basis for the ranking; and (4) forward such information to the procuring contracting officer ("PCO"). *Id.* at 272. The SSP authorized the PCO to: (1) make the best value award determination, documenting the analysis and conclusions leading to such determination; (2) award the contract; and (3) notify

unsuccessful offerors and arrange debriefings as required by the regulations. *Id.* at 270.

6. The SSP established six adjectival ratings for the evaluation of the performance subfactors for each offeror and for the evaluation of each offeror's overall past performance. AR at 278–279. The ratings of exceptional, very good, satisfactory, neutral, marginal, and unsatisfactory were each defined in the SSP. *Id.*

7. The PPET report identified five strengths and one weakness in the technical area, four strengths and two weaknesses in the schedule area (scheduling problems on two different jobs were contained in a single "bullet" point), and four strengths and two weaknesses in the management area. AR at 977–78.

*Id.* The consensus of the PPET as to Metro's past performance as to each of the subfactors was: Technical, Exceptional; Schedule, Exceptional; and Management, Very Good. *Id.*

The PPET report identified six strengths in the technical area, three in schedule, and three in management. AR at 979. It did not list any weaknesses. *Id.* at 980. The PPET report explained that Metro addressed the weaknesses noted in its past performance data in the materials submitted with its offer. Summarizing Metro's past performance, the report stated:

Metro's past performance of relevant jobs that are similar to the subject availability met contractual requirements and exceeded many to the Government's benefit. The past performance being assessed was accomplished with few or very minor problems for which corrective actions taken by the contractor were effective. The contractor's performance over completed contracts was consistently of the highest quality. The contractor received a consensus rating of Exceptional. The PPET perceives a Low Risk in awarding this job to Metro Machine Corp. The contractor's past performance leads to an extremely strong expectation of successful performance.

AR at 980–981.

The chairman of the PPET submitted the committee report to the BVAC for consideration in the award recommendation. The BVAC members convened several days after receiving the PPET Report and adopted the adjectival ratings given to each of the offerors under the Past Performance factor. AR at 987. After reviewing the ratings of Metro and MHI, the BVAC stated in its memorandum to the Procuring Contracting Officer ("PCO"), Richard Ydoyaga:

Review of the PPET Memorandum indicated that either contractor could successfully perform this availability. Award to either of these contractors would entail a low risk in performance of the work requirements. Metro has a slight edge over MHI but those weaknesses noted for MHI were not in areas that would pose problems on this availability. The slight increase in past performance gained by picking Metro over

MHI is not justified by the $5,283.00 (.2%) increase in price. This difference in price makes MHI the Best Value to the Government.

AR at 988. The BVAC recommended the award to MHI. AR at 989.

The PCO did not, however, accept the BVAC's award recommendation. In a document titled "Contract Review Board Control Sheet," the PCO approved an award to Metro rather than to MHI. AR at 993. Mr. Ydoyaga justified his determination, explaining "[a]pproved for Award to Metro Machine based on difference in rating and the additional costs of 5200(sic) being worth the additional rating." *Id.*

The PCO awarded the solicitation to Metro on February 22, 1999. The next day, Mr. Ydoyaga advised MHI of the contract award to Metro and informed MHI that it was rated second. Metro and MHI submitted written requests for written debriefing on February 23, 1999. AR at 1012–14 (Metro), 1020–22(MHI). Mr. Ydoyaga supplied written debriefings to Metro and MHI the following day. *Id.* at 1007–11 (Metro), 1015–19(MHI). MHI then wrote to SUPSHIP Portsmouth to request an oral debriefing. *Id.* at 1023.

Dissatisfied with its debriefing, MHI filed a Verified Complaint in this court seeking a temporary restraining order, a preliminary injunction, a permanent injunction and declaratory relief against the government. MHI's chief complaint is that the Navy failed properly to evaluate Metro's past performance. MHI alleges that Metro has not performed repair work on an FFG and performs little fixed price work. MHI states that it has completed six (6) repair contracts on FFGs in the past four years and that it performs only fixed price work. MHI claims that the unique electronics, weapons, auxiliary and propulsion systems, as well as the space restrictions on an FFG complicate scheduling and execution of repair efforts. MHI complains that the government failed properly to consider this information.

MHI further complains that in evaluating past performance, the Navy failed to consider its pending dispute with Metro concerning Metro's performance fee on the [ ]. MHI

suggests that the dispute indicates disagreement between the Navy and Metro as to the quality of Metro's ship repair work. Additionally, MHI alleges that the Navy failed to consider Metro's current protest against the award of the [] contract, in which Metro specifically challenges the low past performance evaluation it received.

MHI also complains that the government performed a flawed best value analysis. MHI challenges the government's reliance on less relevant past performance experience to justify awarding a higher priced contract to Metro. MHI alleges that the government failed to conduct a proper trade off analysis between price and past performance.

Citing the Navy's failure to evaluate past performance in conformance with its internal guidance or the Solicitation requirements, MHI contests the contract award to Metro and requests that this court (i) stay performance of the awarded contract for the repair of the USS CARR, (i) declare the award of the contract void, and (iii) direct the government to award the repair contract to MHI.

In response to plaintiff's complaint, the Navy filed a motion for judgment upon the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC"). MHI replied by filing a cross motion for judgment upon the administrative record under RCFC 56.1.

The Court held a hearing on the cross motions on Thursday, March 18, 1999. Based on the submitted briefs, the administrative record, and oral argument, the Court DENIES MHI's Cross Motion for Judgment on the Administrative Record and GRANTS the Navy's Motion for Judgment upon the Administrative Record.

II. *Summary of Governing Law*

This court has jurisdiction over MHI's post-award bid protest action under the 1996 amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (Supp. II 1996). The court reviews the challenged agency action according to the standards set out in the Administrative Procedure Act (APA), 5

U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4). Thus, the court must determine whether or not defendant's actions toward MHI were:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law....

5 U.S.C. § 706(2).

■ In determining whether the agency has acted arbitrarily or capriciously towards MHI, the court considers four criteria. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974)[8]: whether (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id., Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998). There is, however, "no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the Government." *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). MHI must demonstrate by a preponderance of the evidence that defendant's actions towards it were arbitrary and capricious. *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997) (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988)).

■ Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.1996); *see also Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). "This requires proof that, had it not been for the statutory or regulatory violation, 'there was a reason-

---

**8.** Both MHI and the government have argued the applicability of the tests enumerated in Keco to the court's determination of the propriety of the government's actions.

able likelihood that the protestor would have been awarded the contract.'" *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665 (1998) (quoting *Data Gen. Corp.*, 78 F.3d at 1562); *see also Day & Zimmermann Servs. v. United States*, 38 Fed.Cl. 591, 597 (1997).

■ While a review of agency action under the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24.28 L.Ed.2d 136 (1971), contracting officials may nevertheless properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985); see *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), *aff'd without op.*, 914 F.2d 271, 1990 WL 122139 (Fed.Cir.1990). This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 726 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

■ The scope of an APA review of agency actions is generally limited to the administrative record developed by the agency. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The court, however, may allow the parties to supplement the administrative record in certain limited situations. *Aero Corp., S.A. v. United States*, 38 Fed.Cl. 408, 411 (1997). Specifically, the court may consider "extra-record" evidence:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)). In this case, the court permitted the supplementation of the administrative record filed by defendant on March 10, 1999 by four documents pursuant to the agreement of the parties at a status conference on March 15, 1999 [9] and by nine additional documents (all

---

9. Declaration of Captain John R. Eckelberry, USN;

Exhibit D to MHI's Verified Complaint: Memorandum for Distribution from the Office of the Assistant Secretary, Research, Development, and Acquisition, Department of the Navy, dated March 13, 1998; Subject: Use of Contractor Past Performance Information in Source Selection;

Exhibit F to MHI's Verified Complaint: Letter to Marine Hydraulics International, Inc. from Supervisor of Shipbuilding, Conversion, and Repair, Department of the Navy, dated July 15, 1998; Subject: Contractor Performance Assessment Reporting System (CPARS); Job Order 8041; USS CARTER HALL (LSD–50); and

Exhibit G to MHI's Verified Complaint: Letter to Marine Hydraulics International, Inc. from Supervisor of Shipbuilding, Conversion, and Repair, Department of the Navy, dated October 28, 1998; Subject: Contractor Performance Assessment Reporting System (CPARS); Job Order 8146; USS BARRY (DDG–52).

providing past performance information about MHI or the defendant-intervenor) filed by defendant on March 16 and March 17, 1999.

We decide this case on MHI's and the government's cross-motions for summary judgment on the administrative record. Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *Jay*, 998 F.2d at 982. If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville* at 911 (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014). However, "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Technology, Inc. v. United States*, 39 Fed.Cl. 34, 43 (1997).

Also before the court is MHI's motion for a permanent injunction. To obtain injunctive relief, in addition to proving its case on the merits, MHI must make three additional showings: "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties." *United Int'l Investigative Servs. v. United States*, 41 Fed.Cl. 312, 323 (citing *FMC Corp. v. United States*, 3 F.3d.424, 427 (Fed.Cir.1993)).

III. *Discussion of Motions for Summary Judgment*

We now consider MHI's Cross–Motion for Summary Judgment on the Administrative Record filed on March 17, 1999 and the

government's Motion for Judgment Upon the Administrative Record filed on March 12, 1999. RCFC 56.1.

In order to prevail, MHI must show, on the basis of the administrative record, that the contract was awarded in violation of the standards of the APA. *See* 28 U.S.C. § 1491(b)(4). If the court finds instead that the contract was awarded without violation of the APA, the government is entitled to summary judgment. *Baird*, at 662; *Bowman Transp.*, at 285–86, 95 S.Ct. 438.

In its Memorandum of Law in support of its Cross–Motion for Summary Judgment on the Administrative Record ("P's Memorandum"), MHI identifies two issues [10] for decision:

> Whether the United States acted arbitrarily and capriciously in summarily rejecting the thorough analysis and unanimous vote of the three person Best Value Advisory Committee.

> Whether the United States acted arbitrarily in conducting the past performance evaluation by awarding Metro Machine Corporation ("Metro") evaluations of "Excellent" in Technical and Schedule performance after individual written evaluations all recommended "Very Good."

P's Memorandum at 1.

The government, on the other hand, argues that the Navy's action in this procurement was reasonable and in accordance with law. Defendant's Memorandum of Law ("D's Memorandum") at 8–9.

As an initial matter, the court reviews the parties' claims under the four criteria for determining if an agency action is "arbitrary and capricious" set forth in *Keco Indus., Inc.*, 203 Ct.Cl. at 574, 492 F.2d 1200:

> The first of the four *Keco* criteria is whether or not there was "subjective bad faith" on the part of the procuring officials, thus "depriving a bidder of the fair and honest consideration of his proposal." *Keco Indus.*, 203

Ct.Cl. at 574, 492 F.2d 1200. Neither MHI's Verified Complaint nor its subsequent pleadings or argument have contained any allegations of bad faith by the government in its conduct of this procurement.

The second *Keco* criterion asks whether or not there was any "reasonable basis for the administrative actions complained of" *Id.* The third *Keco* criterion, "that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations," focuses on the fact that the legal framework of different types of procurements invites different levels of scrutiny. *Id.* The final *Keco* criterion notes that "proven violation of pertinent statutes can, but need not necessarily, be a ground for recovery." *Id.; see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *Data Gen. Corp.* at 1562.[11]

Recognizing the particular relevance of the second and third *Keco* criteria, we now examine the two aspects of defendant's conduct of the procurement on which MHI bases its claims with our focus on whether or not there was any reasonable basis for the government's action and whether or not the action was within the discretion permitted by law for the conduct of a negotiated procurement. *CACI Field Servs.* at 726.

### A. Award by the Procuring Contracting Officer ("PCO")

■ The core of MHI's complaint on this issue is that the PCO, who was the Source Selection Authority ("SSA") under the SSP "arbitrarily" failed to follow the recommendation of the Best Value Advisory Committee ("BVAC") that MHI be awarded the contract. P's Memorandum at 5. MHI states, "The Contracting Officer violated the SSP and FAR § 15.308 because he failed to explain why particular aspects of past performance were expected to impact performance

---

10. There is, in addition, the question of whether MHI is entitled to equitable relief, which is discussed below.

11. Because it appears from the administrative record "that there was a reasonable likelihood that the protestor would have been awarded the

contract," *Data Gen. Corp.* at 1562, we assume, for the purpose of consideration of MHI's motion, that a finding that the award to intervenor was arbitrary and capricious would have been, in fact, prejudicial to plaintiff.

on the USS CARR and why that expected performance was worth the price difference." *Id.*[12] However, there is no record citation for this proposition. P's Memorandum continues, "The SSP required the *BVAC* to explain in its recommendation '[w]hy particular aspects of performance of previously awarded contracts are expected to impact the offerors' expected performance on the subject availability, and why, or why not, it is worth any difference in price'" (emphasis supplied), followed by a citation to the Administrative Record at 277. *Id.* The responsibility to explain the expected impacts of particular aspects of past performance falls on the BVAC. No similar requirement applies to the PCO.

The other defect alleged in the PCO's decision to award to Metro is a violation of 15.308 of the FAR. Section 15.308 provides, in full, as follows:

15.308   Source selection decision.

The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.

Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decisions.

In order to ascertain whether the PCO's decision complied with FAR § 15.308, we look at the documents in the administrative record which show the recommendation of the BVAC and the action of the PCO.

The BVAC recommendation, dated February 22, 1999, comprises two and a half pages and reprises the names of the competitors, their offer prices,[13] a synopsis of the BVAC's ratings of offerors under the past performance factors,[14] a price synopsis[15] and the following comparative rating of MHI and intervenor:

Metro vs MHI; MHI received ratings of Very Good in Technical and Management with a rating of Exceptional in Schedule for an overall rating of Very Good. Metro received ratings of Exceptional in Technical and Schedule with a rating of Very Good in Management for an overall rating of Exceptional.  Review of the PPET memorandum indicated that either contractor could successfully perform this availability.  Award to either of these contractors would entail a low risk in performance of the work requirements.  Metro has a slight edge in past performance ratings over MHI but those weaknesses noted for MHI were not in areas that would pose problems on this availability.  The slight increase in past performance gained by

---

12.   We understand from the context in the Memorandum that the "Contracting Officer" is the SSA or PCO.

13.   The list of competitors and their offer prices provided, in relevant part:

| CONTRACTOR | OFFER |
|---|---|
| Marine Hydraulics International, Inc. (MHI) | $2,340,691.00 |
| Metro Machine Corp. (Metro) | $2,345,974.00 |

AR at 987.

14.   The past performance rating synopsis provided, in relevant part:

| Contractor | Technical | Schedule | Management | Overall Rating |
|---|---|---|---|---|
| MHI | Very Good | Exceptional | Very Good | Very Good |
| Metro | Exceptional | Exceptional | Very Good | Exceptional |

AR at 987.

15.   The price synopsis provided, in relevant part:

| MHI | Metro |
|---|---|
| $2,340,691.00 | $2,345,974.00 |
| | +$5,283.00 (.2%) |

AR at 988.

picking Metro over MHI is not justified by the $5,283.00 (.2%) increase in price. This difference in price makes MHI the Best Value to the Government.

The BVAC recommendation concluded:

Summary: Marine Hydraulics International, Inc. is considered to be the Best Value of the offers received for the reasons listed above. It is therefore recommended that award of the FY99 SRA for USS CARR (FFG–52) be made to Marine *Hydraulics International, Inc.* This recommendation represents the consensus of the BVAC members.

The PCO, in a document titled "Contract Review Board Control Sheet" and dated, as was the BVAC recommendation, February 22, 1999, approved award to intervenor pursuant to the following statement: "Approved for award to Metro Machine based on difference in rating and the additional cost of 5200 being worth the additional rating." AR at 993 ("Decision"). MHI argues that the Decision violates FAR § 15.308 in that it fails to "include the rationale for any business judgments and tradeoffs made or relied on by the [PCO], including benefits associated with additional costs." P's Memorandum at 7 (emphasis omitted).

MHI argues that, since the BVAC recommendation was correct, the PCO acted arbitrarily in rejecting the BVAC's analysis:

After conducting an analysis that is thoroughly documented in the administrative record, the BVAC members unanimously agreed that the slight past performance differential between Metro and MHI was based on areas that simply were not relevant to the USS CARR procurement. Specifically, Metro had slight advantage with respect to one of the three past performance factors, the Technical factor. The BVAC determined that because the USS CARR work package was "non-complex," Metro's advantage with respect to the Technical factor was not relevant to the USS CARR work. AR II at 987.

On the other hand, the BVAC determined that Schedule was the critical past performance factor for the USS CARR. With respect to the Schedule factor, both Metro and MHI were evaluated as Exceptional. AR II at 987. Clearly, the three BVAC members performed the detailed analysis required by the SSP. The BVAC compared the work planned for the USS CARR with the relevant past performance data and determined which factors were important (Schedule) and which were not (Technical). The BVAC unanimously determined that, because MHI and Metro had the same past performance ratings in the important factor and both had acceptable ratings in the other factors. the Best Value would be an award to MHI at its lower price.

The Contracting Officer summarily rejected the BVAC's analysis. He simply lined through the award data for MHI and stated "[a]pproved for award to Metro Machine based on difference in rating and the additional cost of 5200 being worth the additional rating."

P's Memorandum at 6–7.

There are several defects in MHI's argument.

First, MHI's view requires us to agree with two major mischaracterizations of the SSP regarding, first, the relative weights of the three past performance factors and second, the relative weights of past performance and price. The technical and schedule factors within past performance are given equal weight by the SSP. AR at 277. The SSA was not entitled to the view, which MHI urges, that the schedule factor was "important" and the technical factor was unimportant. Nor is the SSA entitled to disregard the relative weights of past performance and price. In this procurement, "Past Performance is approximately equal to Price, with Past Performance being more important than Price." AR at 580. In this case, there were only three past performance factors. MHI and Metro were rated equal in two factors. Metro had a superior past performance score in the third factor. MHI had a very small, indeed, *de minimis,* price advantage. The only way MHI can cast the award as arbitrary or unreasonable is to disregard the most basic terms of the procurement. The PCO's justification, however briefly, points

directly to the relative importance that is given to past performance over price in the, SSP and decides, as he is entitled to do as the Source Selection Authority, that the higher past performance evaluation is worth the small difference in price. It is clear from another document executed by the PCO on the award date of February 22, 1999 that the PCO had before him on that day not only the BVAC, but also the PPET and an Abstract of the Procurement. *See* SUBSHIP Portsmouth Award After Negotiation Business Clearance, AR at 996–997. The Business Clearance memorandum states, in Paragraph D, "Recommendation for Award to Other than Low Offeror," the following:

> After consideration of the BVAC recommendation, the Contracting Officer finds that the additional cost of $5,283.00 for the Exceptional rating of Metro versus MHI's Very Good rating is the better value.

AR at 997.

Notably, MHI does not complain that the PCO failed to exercise, as FAR § 15.308 requires, his "independent judgment." Not only did the PCO exercise his judgment in a way independent of the BVAC; he also exercised it in complete consistency with the Source Selection Plan. While he gave consideration to the BVAC (AR at 997), he made the best value decision on the basis of "a comparative assessment of proposals against all source selection criteria in the solicitation." *See* AR at 993, 997 *and compare* FAR § 15.308.

When asked during oral argument to identify the authority most supportive of MHI's claim that the PCO acted arbitrarily in making the award, MHI's counsel pointed to the *Grumman* decision of the General Services Board of Contract Appeals ("GSBCA"). 3/18/99 TR at 20–21.[16] In *Grumman Data*

*Sys. Corp.*, GSBCA No.11635–P, 94–2 B.C.A. (CCH) ¶ 26,821 (1994), a negotiated contract awarded by the Air Force for information technology for the Joint Chiefs of Staff, the Board set aside the award because of a failure by the SSA to perform a cost/technical tradeoff analysis. *Id.* at 133,384. In *Grumman*, where an award was made to the offeror with a 58.8% ($33,906,690) higher price, the following colloquy was had between the SSA and Board Judge Williams:

> JUDGE WILLIAMS: General, this is by way of clarification. I know that you testified in response to your questions by Mr. Winik that no briefing was given you regarding weighing of a cost-benefit, but did you yourself perform a cost-benefit analysis in your deliberations?
>
> THE WITNESS: No, I didn't.

*Id.* at 133,400.

The case before us is different. Here, the PCO knew the exact amount of the tradeoff and exactly what he was getting for the money. In fact, his focus was directly on the tradeoff. Nor do any of MHI's other authorities suggest that where, as here, the Source Selection authority has specifically considered the exact dollar value of the price difference and the precise technical strength to be obtained, the Source Selection Authority has acted arbitrarily or capriciously.

The PCO in this case exercised his "independent judgment" and specifically identified the "benefits associated with additional costs." FAR § 15.308. The PCO's actions were in no way inconsistent with the relevant terms of the solicitation. Accordingly, the actions of the PCO were neither arbitrary nor capricious nor in violation of the APA.

---

16. In support of its argument that the PCO's decision violates the requirement FAR 15.308 that the PCO failed to provide a "rationale" for the cost/technical benefit trade off, MHI cites several decisions of the Comptroller General, a decision of the General Services Board of Contract Appeals and the decision of the Court of Appeals for the Federal Circuit in *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 960 (Fed.Cir.1993). In addition to Lockheed, MHI's authorities are *MCR Fed., Inc.*, B–280969, 1998 WL 953965 (C.G.), at * 4 (Dec. 14, 1998); *Bios-*

*pherics, Inc.*, B–278508.4, B–278508.5, B–278508.6, 98–2 CPD P 96, 1998 WL 729187 (C.G.), at * 3 (Oct. 6, 1996); *B3H Corp.*, GSBCA No. 12813–P, 94–3 B.C.A. ¶ 27,068 (CCH) (1994); *Grumman Data Sys. Corp.*, GSBCA No. 11635–P, 94–2 B.C.A. ¶ 26,821 (CCH) (1994); *Cobra Techs., Inc.*, B–280475.3, 98–2 CPD P 98, 1998 WL 743567 (C.G.), at * 6 (Oct. 6, 1996); *Westinghouse Gov't & Envtl. Servs. Co.*, B–280929.2, 1998 WL 920325 (C.G.), at * 17 (Dec. 4, 1998); *GTS Duratek, Inc*, B–280511.2, B–280511.3, 1998 WL 840923 (C.G.) (Oct. 19, 1998).

B. *Report of the Past Performance Evaluation Team ("PPET")*

■ MHI asserts "that the [p]ast [p]erformance [e]valuators [r]ated MHI as [s]uperior to Metro and that the Chairman of the Past Performance Evaluation Team [f]ailed to [s]upport her [d]eviation from the Member's [d]etailed [e]valuation [r]eports." P's Memorandum at 11. MHI does not allege any subjective bad faith on the part of procurement officials. Rather, MHI complains that the Past Performance Evaluation Team ("PPET") Chairman lacked a reasonable basis for conclusions contained in the past performance evaluation report and, for that reason, abused her discretion. MHI adds that the PPET Chairman did not adhere to the selection guidance set forth in the Solicitation and the SSP. *Id.* at 12.

MHI points out the following guidance to the PPET with respect to evaluation of past performance:

b. EVALUATION OF PAST PERFORMANCE

1. Past Performance. All PPET members will provide in their own words, a narrative justification supporting the past performance subfactor ratings they believe should be assigned to each offeror. Using the ratings criteria set forth in Section 7.0, the narrative should state the rationale which supports the perceived risk of successful performance of the subject solicitation. This will be based on the level of CPARS or other ratings previously given to the offeror, the relevance of previously rated contracts to the current requirement being competed, any perceived trends over the performance of completed contracts, and the impact of an offeror's proposed or implemented corrective actions, if applicable. Specific areas of the CPARS documents, other past performance inputs, and/or paragraphs in the proposal should be referenced, as applicable. Each PPET member shall also note, with solicitation and proposal references, potential questions and requests for information in the event discussions with the Offerors become necessary. PPET members are to be specific in their write-ups, avoid generalizations of a proposal's merits, and state the facts on which the evaluation was made. Greater consideration should be given to contracts requiring the same or similar type and complexity of work required by the RFP. For purposes of this solicitation, PPET members are to consider an offeror's past performance of the following types of contract/work to be most relevant given the type of effort involved in the this (sic) solicitation: *Previous availabilities on U.S. Navy Surface ships involving miscellaneous structural, electrical, and mechanical repairs and shipalts on (sic) similar size and complexity with schedule and milestone adherence as critical and performed at a contractor's facility.*

2. PPET members will then provide to the PPET chairman their individual ratings (Exceptional, Very Good, Satisfactory, Marginal or Unsatisfactory) for each subfactor. If a firm lacks relevant past performance history then the evaluators will notify the PPET Chairman who will assign a Neutral rating to each of the subfactors for that offeror's past performance.

3. Unless all PPET members agree as to the assigned subfactor rating, the PPET Chairman will meet with the PPET members to determine a PPET consensus rating for each offeror at the subfactor level. In the event consensus amongst the PPET members cannot be reached, the PPET Chairman will make the final determination as to an offeror's subfactor rating.

4. The PPET Chairman will subsequently prepare the PPET's report which will consist of a summary evaluation sheet for each subfactor for each offeror which reflects the PPET's consensus view and the supporting rationale for that rating. Based upon the subfactor ratings, the PPET Chairman will then assign a rating (Exceptional, Very Good, Satisfactory, Neutral, Marginal or Unsatisfactory) for the overall past performance factor for each Offeror, and document the basis for its derivation. All subfactors are equal in importance. All members of the PPET will sign and date the final PPET report.

5. In the event of clarifications and/or discussions, the PPET will reconvene if any additional past information is received.

Should the additional past performance information impact the earlier past performance evaluation, the PPET Chairman will revise the PPET report as necessary. If the additional past performance information does not change the previous PPET rating(s), the PPET Chairman should document the record as to the reasons why this is so.

AR at 276–77 (emphasis in original).

MHI concedes that the individual PPET members evaluated and rated each offeror's past performance in conformance with the prescribed rating criteria and then prepared comprehensive reports, which included the requisite risk assessments. P's Memorandum at 12. MHI asserts that, because each of the PPET members assigned a rating of Very Good to Metro for each of the subfactors, a consensus was reached among the team members as to Metro's rating on the subjectors of past performance. P's Memorandum at 12–13. MHI argues that, in violation of the SSP guidance, the PPET Chairman disregarded the consensus rating of the other team members and arbitrarily assigned higher ratings to Metro for its technical and schedule subfactors. P's Memorandum at 14–15. Citing *Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 599 (1997), MHI protests that the PPET Report is insufficient as a matter of law because it fails to explain how the Chairman reached her conclusion. P's Memorandum at 16.

In *Day & Zimmermann,* the court upheld a bid protest where the administrative record "rather vaguely" revealed why the government made an unfavorable adjustment to the protester's Most Probable Cost Estimate. *Day & Zimmermann,* 38 Fed.Cl. at 598. In that case, the court discovered that the evaluation committee's written recommendations, which were used to adjust the disappointed offeror's cost proposal, were not included in the administrative record. *Id.* at 598–599.

There is no allegation in this case that the Navy has failed to include documents in the administrative record. Rather, MHI complains that the PPET Report did not adequately explain the team's past performance ratings for Metro. In MHI's view, the PPET Report reflected a "fundamental disconnect between the team members' individual views and the final product." P's Memorandum at 11.

The SSP tells the PPET Chairman to prepare the PPET report using "a summary evaluation sheet for each offeror *which reflects the PPET's consensus view and the supporting rationale for that rating.*" AR at 277 (emphasis added). The PPET Report here states that the team reviewed past performance information submitted by each offeror with its proposal as well as past performance evaluations obtained by or existing within the government. AR at 976. Each member of the four person team reviewed the performance information independently, and then the team reached a consensus regarding the degree of risk associated with awarding the USS CARR job to each offeror.[17] *Id.* A review of the administrative record shows that the "supporting rationale" for the past performance ratings of Metro, as documented in the individual evaluations of the PPET members, is accurately reflected in the Chairman's report and provides a reasonable explanation for Metro's performance subfactor ratings.

In evaluating the past performance subfactors for Metro, the individual PPET members reviewed past performance information including evaluations in the files of the Navy's Supervisor of Shipbuilding, Conversion & Repair in Portsmouth, VA ("SUPSHIP Portsmouth"), on four prior ship repair contracts of Metro. AR at 1051–1105. For each ship contract considered, two evaluations of the contractor's work were considered from the SUPSHIP Portsmouth files. *Id.* The comments of the individual PPET members as well as notes from the SUPSHIP evaluators appear in the PPET Report prepared by the committee chairman. AR at 979–80.

MHI complains, however, that the PPET Report did not reflect any of the problems

---

**17.** The PPET Report identifies the team members as: Velma Banks, Chairman Lt. John V. Funn, John S. McCoy, and Marguerite A. Prunty.

discussed in the PPET members' evaluations. In particular, MHI asserts that the PPET Report improperly stated that Metro had no specifically identified weaknesses in any of the past performance subfactors. P's Memorandum at 14–15. MHI claims that the failure of the PPET Report to address Metro's performance shortcomings demonstrates that the conclusions of the PPET Report were flawed and supports of a finding that the PPET Chairman arbitrarily assigned better technical and schedule ratings to Metro.

MHI's argument focuses particularly on the technical and schedule subfactors, which MHI believes were improperly scored as "Exceptional" in the PPET Report. We now look in detail at the administrative record to determine if there was a "disconnect" between the PPET members' individual reports and the final PPET report which renders the final PPET report arbitrary and capricious.

1. *Technical Subfactor of Past Performance.*

MHI contends that the PPET Chairman's assignment of an Exceptional rating to Metro was unreasonable because each of the individual PPET evaluators had assigned Metro a rating of Very Good on the technical subfactor. In reviewing the administrative record, however, the court finds that, although three PPET members assigned Metro a rating of Very Good on the technical subfactor of performance, at least one of the evaluators initially rated Metro as exceptional. Specifically, PPET member Marguerite A. Prunty initialed and crossed out an exceptional rating for Metro under the Technical Section of her Contractor Evaluation Sheet. AR at 950. At the same time, in documenting the reasons for her evaluation, she stated, "In reviewing contractor's quality of product, I found that overall Metro was exceptional." *Id.* She observed that "the k'tor's performance [met] contractual requirements and exceed[ed] many to the Government's benefit." *Id.* She added that "[p]erformance was accomplished with a few or minor problems for which corrective actions taken by the contractor were highly effective." *Id.* She noted that the "ktor submitted reports in an accurate and timely manner" and commented

that "Metro was outstanding in its ability to anticipate problems and quickly resolve or recommend solutions." *Id.* She further stated that Metro was "exceptionally responsive to technical direction." *Id.*

In evaluating the technical subfactor of Metro's past performance, PPET member John S. McCoy wrote that the "contractor met or exceeded the contract requirements on past job orders evaluated." AR at 955. He noted that the "contractor's responsiveness to technical direction was very good" and that "[t]he contractor's recommended solutions were noteworthy." *Id.*

The third PPET member, Lt. John V. Funn, evaluated the technical component of Metro's past performance by stating that "[t]he contractor is open to the exchange of information that helped the availability proceed without delay." AR at 959. He stated that the contractor is "decidedly proactive in anticipating problems and recommending solutions." *Id.*

None of the evaluations of the PPET members reflects a weakness in the technical subfactor. MHI argues, however, that in preparing the final PPET report, the Chairman failed to consider one of the [ ] evaluations of Metro's work on the [ ] in which Metro received a satisfactory (or green) rating on one of the five component measures of technical performance because [ ]. AR at 1073. But, in challenging Metro's technical evaluation, MHI apparently failed to notice the three exceptional and one very good ratings that [ ] gave Metro on the remaining technical performance components in that same evaluation. *Id.* MHI does not dispute that this information, which was produced as part of the administrative record, was available to the PPET members for consideration, and the PPET Report states that the team reviewed past performance evaluations obtained by or existing within the government. *See* AR at 976. Although MHI may disagree with the technical rating of exceptional for Metro, the court cannot find that the decision to score Metro as exceptional on the technical subfactor was without a reasonable basis. *Keco Indus., Inc.*, 203 Ct.Cl. at 574, 492 F.2d 1200. Nor can the court find that Ms. Banks, the PPET Chairman, abused her dis-

cretion in preparing the committee report. *Id.* Accordingly, the court does not find that past performance evaluation, with respect to the technical factor, was performed arbitrarily or in violation of the Solicitation or the SSP. *Id.*

2. *Schedule Subfactor of Past Performance.*

MHI also challenges the PPET Chairman's assignment of an exceptional rating to Metro for the schedule subfactor of past performance. Contrary to the SSP's clear provision that all subfactors are equal in importance, AR at 277, MHI argues that the schedule sub factor must receive heightened scrutiny in the past performance evaluation because the Solicitation defines the most relevant past work to be prior availabilities on Navy ships involving certain repairs and shipalts of similar size and complexity "with schedule and milestone adherence as critical." AR at 276. Noting that Metro's past performance information contained several negative comments in the schedule area, MHI asserts that Metro's exceptional rating for the schedule subfactor of past performance was unreasonable.

MHI specifically points to the negative comments in one of the [ ] evaluations of Metro's performance on the [ ]. In that document, the evaluator, [ ] gave Metro a satisfactory (green) rating on its effectiveness in meeting schedule dates and milestones. AR at 1074.[ ]. *Id.*

Metro's performance of the one year repair contract on the [ ] was the subject of extended discussion during oral argument on the parties' cross-motions. The parties debated whether that contract had been completed early, late, or on time, a debate which reflects conflicting statements in the administrative record. *Compare* AR at 630 *with* AR at 956, 960 *and* 980.[ ]. 3/18/99 TR at 72–74. Nevertheless, the schedule delays during Metro's repair work on the [ ], of which MHI complains, were noteworthy to only one of two Navy evaluators. The second evaluator assigned four very good (gold) ratings for the schedule subfactor. AR at 1067. ([ ]*Id.*)

MHI's effort to characterize as arbitrary and capricious the conclusion in the final

PPET report that Metro was exceptional in the schedule subfactor founders under the weight of the many favorable comments by the members of the PPET. AR 951 (Ms. Prunty); 956 (Mr. McCoy); 960 (Lt.Funn). We note as well favorable Navy evaluations [18] and the contractor's responsiveness to feedback demonstrated in Metro's offer. AR at 581–666.

After reviewing the past performance reports for each of the four prior contracts, the PPET met over a period of nine days before agreeing—as indicated by the signatures of all team members—to the final PPET report to the BVAC. AR at 976, 986. Having reviewed the individual team members' reports and Metro's offer, which includes the several Navy evaluations, the court cannot say that the MHI has shown, by a preponderance of the evidence, that the score of "exceptional" in the schedule subfactor was arbitrary, capricious or an abuse of the wide discretion afforded to the government in its conduct of negotiated procurements. *See GraphicData, LLC,* 37 Fed.Cl. at 779. Absent a finding that the Navy's actions were arbitrary, capricious or an abuse of discretion, there is no basis to consider MHI's motions for injunctive and declaratory relief.

IV. *Conclusion*

Accordingly, based on the foregoing, it is ORDERED, as follows:

1. The Cross–Motion of MHI for Judgment on the Administrative Record is DENIED, and the Navy's Motion for Judgment upon the Administrative Record is GRANTED. The Motions of MHI for a permanent injunction and declaratory relief are DENIED. The Clerk of Court shall enter judgment for the Navy and Metro.

2. On or before March 31, 1999, the parties shall file requests for deletion of protected/privileged material before the court issues its published opinion.

3. Each party shall bear its own costs.

---

18. The PPET members reviewed [ ].