CUBIC DEFENSE SYSTEMS, INC. Plaintiff,

v.

UNITED STATES of America, Defendant,

and

Metric Systems Corporation, Intervenor.

No. 99–144C.

United States Court of Federal Claims.

Dec. 3, 1999.

452

Matthew S. Simchak, Washington, D.C., for plaintiff. N. Richard Janis, Philip J. Davis, Russell D. Duncan, Phillip H. Harrington, Nicole Telecki, Washington, D.C., and Kenneth A. Kopf, Cubic Corporation, San Diego, CA, of counsel.

Dominique Kirchner, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Clarence Long and Alan Luthy, United States Air Force, Washington, D.C., of counsel.

Thomas J. Madden, Washington, D.C., for intervenor. Charles R. Marvin, Jr., Washington, D.C., and J. Scott Hommer, III, and Paul N. Wengert, McLean, VA, of counsel.

## OPINION

BASKIR, Judge.

Plaintiff, Cubic Defense Systems (Cubic), has brought this post-award bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (West 1998), challenging several aspects of the competition and subsequent award by the United States Air Force (Air Force) to intervenor, Metric Systems Corporation (Metric), of a procurement for a pilot training system for United States Air Force, Europe (USAFE). Cubic's amended complaint and its motion for summary judgment and permanent injunction allege five bases

for relief. The Court finds each of these without merit and, accordingly, grants defendant's and intervenor's cross-motions for summary judgment.

### An Introductory Note on Protected Information

This protest has been litigated under a Protective Order entered on March 24, 1999. Rather than issue two opinions, one complete but sealed, and a redacted public version, the Court expressed its intention to file a single published opinion which would sufficiently inform the reader of the issues and their resolution, while still affording the parties the necessary confidentiality. The Court informed the parties by Order of November 29, 1999, of the types of information previously designated as sensitive which it proposed to include. The parties agreed that certain of this material did not require continued protection.

However, the parties sought continued protection for specific strengths and weaknesses of their proposals, certain technical aspects of their systems, and certain other aspects of their proposals. The Court has acceded to this request. Accordingly, the Court has substituted generic terms for specific references to this protected information. The generic terms appear in brackets and include a citation to the administrative record where the specifics may be found. Unless otherwise noted, all citations are to the administrative record filed by the government on April 7, 1999—the record in existence at the time the Air Force made its decision to award the contract to Metric.

### BACKGROUND

#### Procurement History

Cubic and Metric were the sole competitors in a full and open competition for the Air Force's contract to supply and support the USAFE Rangeless Interim Training System ("URITS"). The system utilizes pods affixed to military aircraft along with limited ground equipment to monitor fighter pilot performance in mock combat situations. Utilizing a Global Positioning System URITS processes and stores data on aircraft position, velocity, altitude, and simulated weapons firing. The ground-based debriefing station consists of computer equipment capable of real-time transmission of the fighter sequence. Since the majority of the computer systems that make up URITS are placed within the airborne "pods," the system reduces the need to confine training to a given combat range or airspace. As a result, URITS is described as an "untethered" or "rangeless" system.

Apparently both Cubic and Metric lead the industry in producing this type of equipment. Although the procurement did not involve research and development, and contemplated initial installation and operation within three months of award, the equipment was not quite "off the shelf." Consequently, both competitors' proposals represented varying degrees of risk in their ability to meet requirements of the solicitation.

The procurement began in July 1998. Originally, the Air Force hoped to make the award by October 1, 1998. The USAFE command had already decided not to exercise a contract option for FY 99 on a heavily utilized training range in the North Sea which used tethered systems, anticipating that the more economical and versatile URITS system would be in place and operational October 15, 1998. *See* Affidavit of Major General William T. Hobbins (*Director of Operations, USAFE*), dated April 8, 1999.

In accordance with the solicitation, the Air Force evaluated proposals based upon three factors: *Technical, Past Performance,* and *Cost/Price.* Technical proposals were further scrutinized under three sub-factors: Performance (T–1), Schedule (T–2), and Contractor Logistics Support (T–3).

To the extent that technical proposals met evaluation standards for each sub-factor, the proposal would be rated under the Source Selection Plan ("SSP") with a corresponding color rating: Blue—Exceptional; Green—Acceptable; Yellow—Marginal; and Red—Unacceptable. A proposal assigned a Blue rating "exceeds specified performance or capability in a beneficial way to the Air Force, and has no significant proposal inadequacy." A Green rating is assigned where an offeror's proposal "meets evaluation standards and any proposal inadequacies are readily cor-

rectable." The latter two color ratings are not pertinent to this case.

Equally important, the proposals were evaluated by the Performance Risk Assessment Group (PRAG) for the risk associated with each proposal as it relates to the ability of the offeror to accomplish solicitation requirements. Specifically, the PRAG estimated the potential of the respective offerors' proposals to cause disruption of schedule, increase in cost, or degradation in performance. Proposals were then assigned a corresponding performance risk value of Low, Moderate, or High.

Some of plaintiff's case is directed at the ratings given its own proposal, specifically, Cubic's proposed logistical support (Count 2, formerly Count 6) and its past performance (Count 4, formerly Count 1). Cubic's First Amended Complaint for Declaratory Judgment and Injunctive Relief (Amend.Complaint). The majority of Cubic's case, however, is directed at the Air Force's evaluation of Metric's technical abilities at various junctures over the course of the competition for URITS.

The Air Force planned a demonstration by both offerors for mid-August 1998. Unfortunately, it proceeded unsatisfactorily. Metric declined to participate and, accordingly, its system was considered untested and unproven at that stage. Cubic did participate, but the results were found to be "insufficient to award with acceptable risk." The circumstances of this August flight demonstration will be examined in further detail in connection with Count 5 (formerly Count 4) of Cubic's amended complaint.

Finding that both offerors had failed to meet the solicitation requirements, the Source Selection Authority (SSA) reopened discussions with both companies and continued to evaluate the proposals as they were modified and perfected. The SSA supported this decision with a memorandum explaining his rationale, which we will examine in further detail momentarily.

In December 1998, the Air Force conducted another demonstration. Both systems performed satisfactorily, but not ideally. The Air Force identified some deficiencies in Metric's [technical performance]. Administrative Record (AR) at 7130–32. One of Cubic's alleged errors, new Count 3, concerns the adequacy of the Air Force's documentation of its analysis of the deficiencies.

By the end of January 1999, the Air Force had completed analyzing the various factors and advised the competitors that it had reached the stage of final offers and submissions. Both Cubic and Metric responded to the Air Force's February 3, 1999, letters requesting Final Proposal Revisions (FPRs). Cubic improved its proposal by adding two capabilities that had been specifically solicited by the Air Force in its letter to Cubic. Metric submitted data recently gathered from its experience with the Israeli Air Force which had not been expressly requested in the Air Force letter but which was relevant to the matters arising out of its December demonstration. This Metric submission forms the crux of another error alleged by Cubic as new Count 1, described as the Israeli flight data issue.

After submission of FPRs, evaluators briefed the SSA and Air Force representative on the extent that each proposal satisfied the procurement factors. The evaluations follow:

*Technical*

For each of the three technical subfactors, Cubic received a rating of "Green—Acceptable" and "low risk." Its fourth count challenges the Green rating for Contractor Logistical Support. Metric received a "Green—Acceptable" and "low risk" rating in two technical sub-factors, Schedule (T–2) and Contractor Logistics Support (T–3). But Metric also received a "Blue—Exceptional" with "moderate risk" rating for the technical sub-factor, Performance (T–1). This latter rating, implicitly at the core of Cubic's challenge to the award, is relevant to our discussion of the Israeli flight data issue.

Thus, in the estimation of the technical evaluators under the important sub-factor T–1, Performance, both offerors were technically acceptable and satisfied the requirements of the procurement. Mr. John Provine, the agency's technical chief for the URITS procurement, emphasized that

Metric's proposal featured more capabilities—it provided all four of the desired capabilities—than Cubic's system, even though it carried with it a higher performance risk. Affidavit of John C. Provine, dated July 8, 1999, at ¶ 20 (Plaintiff was permitted to go outside the administrative record and depose Mr. Provine, in order to test this affidavit).

### Past Performance

Cubic's performance risk assessment was "moderate risk," the focus of its second count. Metric's performance risk assessment was "low risk."

### Cost/Price

The cost of Metric's proposal was $36,985,000, over 20 percent lower than Cubic's proposed cost, $44,879,000.

The contract was awarded to Metric on February 19, 1999. Metric has been supplying pods to USAFE under the URITS contract on a compressed delivery schedule since May 20, 1999. Under the terms of the contract, a total of 88 pods and eleven debriefing stations were to be phased-in at three locations in Europe, and at a fourth site later determined to be Saudi Arabia. At the first site, Spangdahlem Air Base in Germany, six pods and one debriefing station were to be in place within the first three months following award; fourteen more pods and two briefing stations were to be delivered incrementally thereafter, and be fully operational within six months of contract award. Approximately nine months after contract award the successful offeror was to provide Required Asset Availability for the other identified locations. The procurement contract is for five years, with operational support to continue after installation is complete. In a related case, Cubic filed an unsuccessful challenge in this Court with respect to the fourth, optional location. *See Cubic Defense Systems, Inc. v. United States,* 45 Fed.Cl. 239 (1999).

We will focus on the procurement and the evaluation of the two competitors in more detail in the following pages.

### Litigation History

At later points in this Opinion, we will have occasion to comment on some of the strategic and tactical decisions made by Cubic in prosecuting this litigation. At this juncture, we offer a summary of the procedural aspects of the case to provide a context for those observations.

### Initial Complaint

The Air Force debriefed Cubic on its proposal February 19, 1999, following the award to Metric. Cubic filed a complaint with the Court on Friday, March 19, a full 30 days later. The Court immediately scheduled a telephonic status conference for the next business day, March 22, 1999.

The complaint alleged eight errors in the procurement: (1) failing to conduct meaningful discussions of Cubic's past performance; (2) awarding a contract in excess of available funds; (3) violating the Anti–Deficiency Act and the Adequacy in Appropriations Act; (4) failing to eliminate Metric when it fell short of Mandatory Minimum Requirements; (5) failing to recognize the high risk in Metric's proposal; (6) failing to follow the Solicitation Evaluation plan in addressing strengths demonstrated by aspects of Cubic's proposal; (7) failing to allow Cubic to correct a mathematical error in its proposed price; and (8) improperly awarding a contract without sufficient authorized and available funds to purchase the systems. In its complaint Cubic sought both temporary and permanent injunctive relief.

At the initial conference, the Court inquired whether the government would be willing to suspend voluntarily performance of the contract during an expedited consideration of the case. But when the government declined to do so, Cubic let the matter drop, abandoning its request for temporary injunctive relief. The government made it clear during the status conference that Metric had begun producing the pods, and that the initial performance deadline was then only two months away.

Clearly, time was Cubic's enemy. Accordingly, the Court deferred to the plaintiff in setting the schedule. The government agreed to file the administrative record by

April 7, 1999. Cubic proposed and the Court adopted a briefing schedule which required Cubic to file its summary judgment motion by May 21, 1999, with briefing to be completed by July 9, 1999, and oral arguments on July 14, 1999, two months after Metric's initial installation at Spangdahlem Air Base was due and approximately five months after the award.

On April 16, 1999, Cubic sought ten depositions and 31 document requests in an extensive discovery motion. The request was opposed by the government and Metric, which had since intervened without opposition. In opposing discovery, the government cited portions of the administrative record which contained information Cubic sought in discovery.

At an April 28, 1999, hearing the Court directed the parties to resolve the disputed discovery through examining the administrative record and supplementing it where appropriate. Plaintiff suggested—promised would be too strong—it might be able to limit or narrow its allegations after a thorough review of the administrative record and after retaining an engineering consultant. On May 18, 1999, the Court admitted Cubic's expert, Mr. James T. Parsons, to the Protective Order.

On May 19, two days before its summary judgment brief was due, Cubic sought an extension of three weeks in the briefing schedule. Cubic's request threatened to jeopardize the scheduled oral argument by pushing it into mid August. The Court granted the extension, but compressed the briefing schedule to permit an early August argument. This imposed on Metric, the government, and the Court minimal opportunity to receive and digest Cubic's last filing, now extended to July 23, 1999.

A week later, on May 28, and about 2 weeks prior to the new deadline for its summary judgment motion, Cubic filed a revised discovery motion directed at the very issues for which it sought summary judgment. At the same time, plaintiff filed its amended complaint.

*Amended Complaint*

Cubic filed its amended complaint on June 1. While it dropped five counts (2, 3, 5, 7 and 8), it did not noticeably narrow the case. It retained three counts: Cubic's challenge regarding its past performance, the evaluation of its contractor logistical support, and the claim that the August flight demonstration was mandatory. Cubic added counts having to do with documentation of the Air Force decision (new Count 3) and Metric's submission of Israeli flight data (new Count 1). In a curious move, it completely renumbered the five counts of its new complaint. Counts 1, 4, and 6 now became Counts 4, 5, and 2, respectively.

On June 16, 1999, Cubic filed its motion for summary judgment. Such a motion, of course, requires that there be no genuine issue as to any material fact. RCFC 56(c). Even more to the point, Cubic's motion for summary judgment explicitly and repeatedly stated "that there are no genuine issues as to any material fact and Plaintiff is entitled to judgment as a matter of law." Plaintiff's Motion for Summary Judgment and Permanent Injunction at 1; Plaintiff's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment (Pl.Br.) at 1, 18. Also, its motion was not predicated or dependent on further discovery. In fact, Cubic's brief in support of its revised discovery motion, dated May 28, 1999, had even suggested that the requested depositions would "eliminate" the issues alleged in its amended complaint. *See* Plaintiff's Memorandum in Support of its Motion for Leave to Serve Two Notices of Deposition at 2. With Cubic's dispositive motions, its May 28 discovery motion had thus been abandoned or overtaken by events.

*August Oral Argument*

Although the Court had compressed the briefing schedule to preserve a prompt oral argument, the effort was wasted. On August 2, the day set for argument on summary judgment motions, plaintiff raised as a preliminary matter its May 28 discovery motion. Plaintiff had not requested a continuance as the date of argument approached. Nor had it given even informal notice of its intentions to the Court or, apparently, to other counsel.

Obviously a favorable ruling on this motion would necessitate a postponement of the oral argument. When asked why the discovery was necessary, Cubic advised the Court that there were material facts in dispute, a direct repudiation of its earlier written and implicit disclaimers. It is probably unnecessary to state that Cubic had never filed a written statement of disputed facts, as required by RCFC 56. The Court directed Cubic to file promptly a written statement of those disputed facts. Its filing of August 5, 1999, was utterly inadequate.

The Court advised Cubic that if it wished it would hear and determine the discovery motion, but that oral argument on its dispositive motion would necessarily be put off until September even if the motion failed. Given the choice, Cubic agreed to defer the hearing on its summary judgment motion. As it developed, Cubic's argument for discovery failed of any real merit. However, the Court granted a limited deposition only because of a tactical misstep by the government. The schedule slipped another seven weeks.

*September Oral Argument*

Oral argument on the dispositive motions was finally held on September 21, 1999. On its major alleged error, the Israeli flight data, Cubic requested an hour to an hour and a quarter. The entire time was devoted to a new argument never briefed. In legal support, Cubic offered at least five cases, four of which were not contained in its briefs. This argument, of course, could not be addressed by Metric and the government. We will address the significance of this development later in this Opinion.

Cubic's written briefing also had some striking omissions. The black-letter law of challenges to government contract awards requires that the plaintiff show the alleged errors were prejudicial. But Cubic did not specifically address this element in connection with most of its alleged errors, and made only passing reference in others. What it decidedly did not do was offer the Court any discussion of the requirements and standards that allegations of error must meet to be successful. And although its initial and amended complaints sought injunctive relief, and its summary judgment motion and draft order did as well, Cubic failed to argue its entitlement to this extraordinary relief. We address these failings later in the Opinion.

## DISCUSSION

This Court will grant a motion for summary judgment where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). The movant must establish the absence of any dispute of material fact, a fact of consequence to the outcome of the case. *Cincom Systems, Inc. v. United States,* 37 Fed.Cl. 663, 670 (1997). When a case is before the Court on cross-motions for summary judgment, such as the case at bar, we hold each party to this standard. *Kanehl v. United States,* 38 Fed.Cl. 89, 98 (1997)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Inferences drawn from the evidence, in this case the administrative record, are viewed in the light most favorable to the opposing party. *Id.; Cincom Sys.,* 37 Fed.Cl. at 671.

Here we apply this standard in the context of a post-award bid protest where, with a few cited exceptions, the evidence is limited to the administrative record. The scope of review, as defined by the Administrative Procedures Act, is narrow. 5 U.S.C. § 706(2) (1994); *see* 28 U.S.C. § 1491(b)(4); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

We set forth next the guiding principles controlling our review of Cubic's allegations. We will then apply these principles in our discussion of each of its claims. Thereafter, we will address Cubic's plea for relief.

### Standards of Review

▮ This Court reviews agency action in a post-award bid protest such as this one under a deferential standard, only setting aside an agency action or decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Whether agency action is arbitrary or capricious turns on whether: (1) there was subjective bad faith on the part

of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974); *Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998). The inquiry is "searching and careful," *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

■ In alleging error, the plaintiff must do more than identify circumstances where the contracting officer or the SSA made a mistake. The plaintiff must show that the claimed misstep was so excessive as to fall outside the decision-maker's ambit of discretion. The protester must also demonstrate that this constitutes a significant, prejudicial error in the procurement process.

We limit our inquiry to "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (citations omitted). In fact, this Court has described the plaintiff's burden as "demonstrat[ing] that there was no rational basis for the agency's determinations." *Baird Corporation v. United States*, 1 Cl.Ct. 662, 664 (1983); *Cincom*, 37 Fed.Cl. at 672.

The cases discussing administrative review describe in various ways what proof is required to establish legal error, but all the cases have in common the extreme measure of deference afforded the agency decision. Certainly the deference is not absolute, but where a Court is called upon to review technical matters that are within the agency's expertise, the highest degree of deference is warranted. *See G.E. Government Services, Inc. v. United States*, 788 F.Supp. 581, 590 (D.D.C.1992)(courts are at their "most deferential" when reviewing agency's technical determinations).

As the government notes, this was a negotiated procurement, a fact that justifies even more deference than usual. *Delbert Wheeler Const., Inc. v. United States*, 39 Fed.Cl. 239, 247 (1997), *aff'd*, 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998); *Cincom*, 37 Fed.Cl. at 671–72. And finally, the Air Force is accorded still greater deference where, as here, the

procurement is a "best-value" procurement. FAR § 15.605(c); *see TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed.Cir. 1996)(though it may have reached a different result, General Services Administration Board of Contract Appeals may not overturn agency decision unless it is "wholly without reason"); *accord, E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996).

Many of the claims addressed below ask us to review factual conclusions and technical judgments on highly sophisticated matters. For example, Cubic questions the validity of relative evaluations of technical risk. In other areas, Cubic challenges extremely subjective determinations such as which proposals represent a better value and overall benefit to the Air Force. Nowhere in its papers does Cubic wrestle with one of its major hurdles, the discretionary aspect of the Air Force decisions and the deference that must be afforded those judgments. In recognition of the great weight of authority prescribing the appropriate scope of our review of agency determinations, in these areas we cannot substitute our judgment for that of the Air Force personnel involved in a technical procurement such as URITS. *See Hydro Engineering, Inc. v. United States*, 37 Fed.Cl. 448, 467 (1997) ("Technical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess.")(citing *E.W. Bliss*, 77 F.3d at 449).

■ But this describes only one element Cubic must meet. Assuming it has demonstrated that the agency acted outside of its ambit of deference, the protestor must next show that the error affected it in an adverse way, by favoring its competitors or by causing harm to itself. In other words, the plaintiff must show that the error was not harmless. But its burden is still not met. The protester must also demonstrate that the error in the procurement process was significant. In doing so, it is plaintiff's burden to show that but for the agency's error, there was a "substantial chance" the protester would have been awarded the contract. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999)(citing *Statisti-*

ca, Inc. v. Christopher, 102 F.3d 1577, 1584–85 (Fed.Cir.1996) and *CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1574–75 (Fed. Cir.1983)).

When we consider the various circumstances of this case which enhance the deference to agency action beyond the ordinary APA standard, and then add the requirement of showing prejudice, plaintiff's burden is great, indeed. Thus must Cubic "[strive] to pile Ossa on Olympus, and on Ossa Pelion, with its leafy forests, that they might scale the heavens."

*Challenges to Metric's Technical Proposal*

Cubic's initial complaint took direct aim at its competitor's technical solution, asserting it was not possible to provide all of Metric's claimed capabilities within the pod. See original Count 5. That count was dropped in favor of the Israeli flight data issue (new Count 1) and the documentation issue (new Count 3) which, together with the August demonstration issue (now Count 5), constitute Cubic's indirect challenge to Metric's technical proposal. Because they are related, we treat them first.

*Metric's Failure to Perform Flight Demonstration (Count 5)*

In August 1998, the Air Force scheduled both ground and in-flight demonstrations of the offerors' respective systems. Metric performed the ground portion, but declined to perform the in-flight portion of the demonstration. Cubic conducted both aspects of the system demonstration on schedule. However, the SSA found the results yielded by Cubic's performance were "insufficient to award with acceptable risk." Since neither Cubic nor Metric demonstrated acceptable risk in the wake of the August demonstrations, the Air Force re-opened discussions in October 1998 and called for a second set of flight demonstrations. Both Cubic and Metric performed the demonstration in December 1998.

Cubic's complaint characterizes Metric's refusal to perform the August 1998 flight demonstration as a failure to meet a Mandatory Minimum Requirement (MMR) of the solicitation. Satisfaction of an MMR is a prerequisite for consideration within the "competitive range." See Air Force Federal Acquisition Regulation Supplement (AF-FARS), 48 C.F.R. Part 53, Appendix BB ¶ BB–310(c)(4); Federal Acquisition Regulation (FAR) § 15.206(a), 48 C.F.R. § 15.206(a). Accordingly, Cubic argues, Metric should have been eliminated from the competition upon failing to perform the initial flight demonstration. In the alternative, plaintiff asserts that by refusing to enforce the demonstration "requirement," the Air Force amended the solicitation in favor of Metric, and thereby treated the offerors unequally.

In support of its interpretation, Cubic points to mandatory language within the solicitation and evidence in the record that Metric understood the flight demonstration to be mandatory.

In fact, the original draft solicitation described the demonstration as a separate subfactor under the technical factor. It was clearly intended as an MMR, and the draft included the required AFFARS language for a mandatory requirement. Industry reaction to the draft solicitation disapproved of having the demonstration a mandatory requirement. As a consequence, the revised solicitation eliminated the separate, mandatory nature of the demonstration and denoted it as an "input."

Both competitors recognized that the Air Force had reduced the importance of the demonstration, and both were unhappy about this. Cubic, in particular, repeatedly objected that the Air Force approach would permit marginally qualified bidders into the competition. Cubic's views in the summer of 1998 are in stark contrast with its litigation-driven interpretation in the summer of 1999, a bemusing inconsistency. Moreover, Metric's last -minute decision not to participate apparently was in connection with its protest over the terms of Cubic's participation. Still, for this issue, the Court is charged with reviewing the terms of the solicitation and the actions of the procuring agency. There is little utility in examining the subjective knowledge and understanding of the competitors.

■ We turn to the solicitation. An MMR must be specified as such within the solicitation. *See Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 229, 1992 WL 19716 (1992); AFFARS at App. BB–203(b)(2)(ii). The solicitation states that offerors "*shall* provide a system demonstration plan," but does not specify mandatory aspects of such a demonstration or characterize the demonstration as a "pass/fail" stage of the procurement. AR 934 (emphasis added). Nevertheless, Cubic argues, only through this flight demonstration could the Air Force evaluate Metric's performance risk and its ability to satisfy other mandatory requirements set forth in the System Requirements Document.

In light of this history, we are hardpressed to agree with Cubic that participation was mandatory. But even if it were, this does not advance the plaintiff's cause. We reject Cubic's asserted error for at least three independent reasons, as well: (1) Cubic failed the demonstration and was itself given a second opportunity to compete; (2) the SSA's decision to reopen discussions when the only two participants had fallen short of demonstrating system requirements, was reasonable and within his discretion; and (3) Cubic waived the issue by failing to make a timely protest.

■ In trying to demonstrate prejudice Cubic argues simply that with Metric disqualified, it would have been entitled to the award by default. This argument ignores Cubic's own unsatisfactory performance. This point was addressed only briefly by Cubic in its complaint: "[a]lthough the Air Force did identify two technical risk areas regarding [Cubic's] in-flight testing, neither was of requisite significance to justify disqualification." Amend. Complaint at ¶¶ 58–60. Cubic's written briefs do not discuss the Air Force's adverse finding. Moreover, Cubic does not consider the SSA's discretion in choosing to re-open the procurement, and certainly does not address the rational basis for this decision. *Baird Corp.*, 1 Cl.Ct. at 664. We do so here.

The decision memorandum drafted by the SSA demonstrates the rationale for his decision. That memorandum, in pertinent part, observes:

Offerors have failed to adequately demonstrate with data and/or with system flight demonstration that ... system requirements can reasonably be expected to be fulfilled in accordance with the required schedule.

\* \* \*

The acquiring activity must ensure that the user can reasonably rely on fulfillment of contract requirements so that the user does not commit resources to a training schedule which the offerors have not fairly demonstrated they will meet. The acquiring activity must also take into consideration the offerors' investment in the competition ...

\* \* \*

The additional time consumed by these tests represents an investment in risk reduction through adequately informed selection of the best value proposal. One can only guess whether the government's schedule needs would be better served by award to one of the offerors or pursuit of this additional information, but award without it could be unfair and would be imprudently speculative in light of the potential consequences of error.

Therefore, I have decided to re-open discussions with both offerors to address the risk of their proposals as detailed above. Following discussions a new set of Final Proposal Revisions will be requested.

AR 7551.

■ The SSA has considerable discretion in determining whether to eliminate an offeror from the competitive range. With both offerors failing to perform, the call for another round of demonstrations was the only viable option. There is no requirement for an agency to award a contract to an offeror, even a sole competitor, and certainly not to one that has failed to meet system requirements. Likewise, it goes against principles of government contracting to exclude prematurely from competition an offeror whose proposal has a reasonable chance of being selected. Federal acquisition policy favors inclusion of such a bidder within the

competitive range in the early stages of a procurement. *Birch & Davis Int'l,* 4 F.3d at 974; FAR §§ 15.306(c)(1) and 15.609(a); AF-FARS at App. BB–311(b). Cubic has not established that the decision to allow further system demonstrations lacked a reasonable basis. *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 643 (1997).

 Finally, Cubic failed to complain of this alleged error at the appropriate time— when the Air Force continued to allow Metric to compete, or at least prior to submitting its final offer. In the present litigation, Cubic confidently proclaims that the demonstration was an MMR. If that were its view, one would have expected it to challenge Metric's continued participation in the competition after August 1998. At a minimum, Cubic should have requested clarification of language of the solicitation to develop the record and preserve its rights. *Beacon Const. Co. of Mass. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504; *Allied Technology Group, Inc. v. United States,* 39 Fed.Cl. 125, 146 (1997); *PCL Const. Services, Inc. v. United States,* 41 Fed.Cl. 242, 252–53 (1998).

Only plaintiff knows why it failed to raise this issue with the contracting officer. The administrative record, and the reasonable inferences that can be gleaned from it, suggest that Cubic, an experienced defense contractor engaged in a critical competition, realized it had nothing to gain by raising the issue at that point. Whatever the reason, this issue was not previously raised. The Court regards it as waived. *See generally, Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 353 n. 5 (1994)(party choosing to participate in second round of submissions rather than appeal, waived challenge to contracting officer's decision to reopen discussions); *Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 789 (1991)(finding favor with GAO rule requiring party to protest second round of negotiations before closing date for new submissions, noting "an offeror runs a great a great risk if it delays in protesting a decision to reopen negotiations").

### Documentation of the Analysis of Metric's Technical Proposal (Count 3)

In the third count of its amended complaint, plaintiff challenges the documentation of the analyses and conclusions reached concerning Metric's technical proposal. The Court finds that the agency's conclusions are adequately documented, and are in fact supported by the administrative record.

Both offerors were routinely provided Evaluation Notices (EN's) describing shortcomings in the technical aspects of their proposals. Cubic's complaint details recurring notices about [certain deficiencies in Metric's performance] encountered during the December flight demonstration. Amend. Complaint at ¶ 116. Also, Metric proposed to provide all the desired capabilities of URITS in a manner that Cubic has maintained cannot be met with existing technology. *Id.* at ¶ 126.

Take one illustration. The Air Force pressed Metric on [certain aspects of its technical performance]. Initially, Metric submitted additional flight data—data from flights conducted for the German Air Force—that somewhat mitigated the December demonstration results. AR 7055. Although on different aircraft, obviously, the Air Force noted results that satisfied contract requirements [with respect to one noted deficiency] and exceeded contract requirements [with respect to the other noted deficiency]. AR 7055. Any optimism occasioned by the receipt of this data was tempered, however, with the Air Force's documented realization that "failure to meet [the performance requirement] on the operational aircraft upon which the system is to be flown represents a performance risk to the program." *Id.*

Metric ultimately traced its failure to meet the [the performance requirements] to [an easily remedied problem]. Metric offered solutions to the deficiencies, supported by more data and analysis, and indicated those solutions would be borne out in flight tests anticipated in the near future—what we have come to label as the "Israeli flight data." *See* the following discussion of Count 1; AR 5570–94, 5765, 5826–31, 5866–74, 7563, 7571–73.

Upon identifying the source of many of the problems encountered in Metric's flight dem-

onstration, but prior to receiving the Israeli flight data, the technical team evaluated Metric's proposal assuming [the technical fix was employed]. Essentially, with the "fix," Metric was then required to quantify the extent to which the [the identified problem] was responsible for the deficiencies noted in the December flight demonstration. Cubic has not suggested that this extrapolation of data was scientifically unsound. Indeed, in this challenge and in its direct challenge to the Israeli flight data, Cubic has never questioned the validity of the analyses or the data, or the efficacy of the remedy.

As directed, Metric calculated the effect of [the identified problem on the two performance deficiencies]. AR 5864—74. Discounting the [identified problem], Metric met the required mark for [one of the performance deficiencies] and [nearly met requirements for the other noted performance deficiency]. Incidentally, Cubic has complained that the record lacks an explanation for the Air Force's "acceptance" of [a lower standard]. We find no indication that the Air Force [lowered the standard]. Indeed, the record is not silent in this area, as plaintiff suggests. When it submitted the estimates, Metric accounted for the remaining shortfall by noting the effects of [other variables]. AR 5868–69. The Air Force was certainly entitled to rely upon, and give whatever weight it chose to this explanation when determining the performance risk inherent in Metric's proposal.

So, although Metric never demonstrated with URITS flight demonstration data [the specific performance requirements] prior to completing its technical proposal, it provided extensive analysis accounting for shortfalls. Technical evaluators addressed the issue in a series of "offeror response summaries," and the Air Force concluded in its final decision briefing that Metric's problems were solved through analysis and flight data. Still, even after receipt of the corroborative Israeli flight data, the evaluation of Metric's proposal remained unchanged with a performance risk of "moderate." AR 7571–73.

■■■ When reviewing an agency's award under our bid protest jurisdiction, the Court must uphold the agency's decision so long as a rational basis is articulated and relevant factors are considered. *Delbert Wheeler*, 39 Fed.Cl. at 247. In addition, there is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Cincom Sys.*, 37 Fed.Cl. at 669 (citations omitted). Cubic has not alleged bad faith—there is no suggestion that the Air Force desired anything but the best value for the government. Nor has Cubic alleged defects in the data or faults in the analyses. Indeed, Cubic made that explicit during argument. Rather, we understand its complaint to be that the decision-making process does not have an adequate "paper-trail" permitting the Court to assure itself that the decisions were rationally based.

Cubic offers citations to a number of Government Accounting Office decisions on the requirement to document analyses. The Court notes this authority and concurs in it. *See e.g., S-Cubed,* B–242871, 91–1 CPD ¶ 571 (June 17, 1991)(implicit in requirement that agency judgment be reasonable is requirement that judgment be documented in sufficient detail to show it is not arbitrary). But the real question is *how much* documentation is necessary to trace the decision-makers analysis. More or less analysis may be required depending upon the circumstances.

Cubic concedes that the administrative record includes "Metric's proposal, the EN's identifying deficiencies in Metric's proposal, Metric's responses to the EN's, and the Air Force's summary conclusions regarding the data, including the Israeli flight data, submitted by Metric." Amend. Complaint at ¶ 118. Plaintiff's quarrel with the record is that it lacks "descriptive analysis" of Metric's data or its responses to ENs. *Id.* at ¶ 119.

The FAR requires "assessments of each offeror's ability to accomplish the technical requirements," and "*appropriate* supporting narrative." FAR § 15.305(a)(3)(i)-(ii)(emphasis added). When the parties were sent EN's denoting deficiencies or requesting a clarifications, technical evaluators prepared "offeror response summaries" and conducted briefings addressing areas of compliance or noncompliance. Collectively, these activities which are memorialized in the administrative

record, map the process by which the offerors reacted to Air Force concerns and refined their proposals. In a case such as this one, where several hundred pages of the administrative record trace a continuing dialogue between the agency and Metric concerning its technical proposal (the entire administrative record is over 8,000 pages), the Court encounters no difficulty in determining upon what basis the technical evaluation was made. The Court finds that the Air Force's conclusion about Metric's technical proposal was rational and supported by the administrative record.

It is noteworthy that Cubic has never suggested that any of the data is in error. It has made no showing that the technical evaluators erred in considering Metric's proposal prior to receipt of the Israeli flight data. Certainly, we would have a far different situation if the evaluator's conclusions were in conflict with the evidence, or if the evidence was so defective as to cast doubt on the basis for the conclusion. We believe that the data is consistent with the conclusion, and Cubic does not contend otherwise.

There is no doubt that Metric, like Cubic, fell short of perfection in its initial trials. But, as we have found, these trials were but one source of "input," not mandatory minimum requirements. The Metric data and analysis that followed pointed to the source of the problem, and proposed a solution. The Air Force concurred but gave "moderate" risk because the solution was untested in actual performance. The agency did not change its evaluation even after consideration of the Israeli flight data, where it appears that Metric met expectations. We find no inadequacies in the Air Force analyses or the documentation of it.

### Israeli Flight Data (Count 1)

Near the conclusion of the competition, the Air Force requested Final Proposal Revisions (FPR's) from both offerors. The agency particularly sought revisions to price. The text of its letter to both companies read:

[S]ince *no further discussions are contemplated* after receipt of final proposal revisions, technical changes and revisions to

terms and conditions of the model contract are *neither expected nor encouraged.*

AR 7731 (emphasis added). Shortly thereafter, Metric provided the Israeli flight data that it had earlier promised would confirm the remedy for its [identified technical deficiencies]. In response to an EN, dated January 19, 1999, Metric had stated:

We have already delivered several pods to overseas customers with this [solution] installed, and have not had any problems with [identified technical deficiencies] to date. Several demonstrations ... in various countries are scheduled in late February and early March that will provide additional validation for these changes long before any URITS deliveries are required.

AR 5868.

In submitting the flight data, however, Metric specifically stated it was not revising its technical proposal. The data, results of flight tests performed by the Israeli Air Force, was cited by the SSA as evidence of Metric's technical ability to perform the contract. *See* AR 7930 ("solution to [identified technical deficiencies] by analysis/flight data"). In the first count of its amended complaint, plaintiff challenges the Air Force's consideration of this data.

Cubic initially offered one legal theory contesting the submission of the Israeli flight data. In Count I of its amended complaint, Cubic alleges that the submission of the data combined with the Air Force consideration of it, constituted "unequal treatment":

The Air Force did not follow the evaluation plan of the Solicitation or treat offerors equally when it (i) changed the ground rules it set for the submission of [FPRs] and (ii) evaluated and considered the technical information submitted by Metric with its FPR without affording Cubic a similar opportunity to update its technical proposal with additional information.

Amend. Complaint at ¶ 103.

Cubic's assignment of error assumes that the Air Force's consideration of the data amounts to "discussions," or at least an attempt to reopen discussions, between Metric and the Air Force. *See* Amend. Complaint at ¶ 101 ("The Far (sic) requires agencies to

treat all offerors fairly when evaluating proposals ... [f]urther, an agency may not engage in discussions that favor one offeror over another" (citations omitted)).

Cubic maintained this theory throughout the briefing of its summary judgment motion:

> Whether, as a matter of law, the Air Force's award to Metric was arbitrary, capricious and otherwise a violation of law where the Air Force, *after purportedly closing discussions, considered additional flight test data* from Metric, which allowed Metric to revise or modify its purpose (sic) or was necessary to render Metric's proposal technically acceptable, *without reopening discussions with Cubic and asking for another round of Final Proposal Revisions?*

Pl. Br. at v (Statement of Genuine Issues)(emphasis added).

> The record shows that, at a minimum, the Air Force: (i) violated well-established procurement law regarding *ex parte* discussion after final proposal revisions by accepting and evaluating technical data provided by Metric in its [FPR], even though the Air Force specifically advised the offerors that discussions were closed and it would not accept such data; ...

Pl. Br. at 2 (Preliminary Statement).

> The Air Force Violated Basic Procurement Requirements By Conducting Discussions With Metric After Receipt Of Final Proposal Revisions.

Pl. Br. at 19 (first sub-heading of Argument section).

Cubic persisted in its second summary judgment brief:

> Cubic's complaint here is not that Metric improperly changed its technical proposal, but rather that Metric initiated the reopening of discussions ... in an improper attempt to influence evaluators after the Air Force had closed discussions, *and that the Air Force then considered that data.*

Pl. Opp. at 5. (emphasis in original);

> [w]hile the Air Force surely had the right to conduct such *discussions* with Metric, even after it had received the FPRs from both offerors, the law requires that it then

should have gone to conduct *discussions* with Cubic and then request new FPRs

Pl. Opp. at 9. (emphasis added)

However, at oral argument, counsel devoted the majority of his time to different arguments—that Metric had couched its submission in such a way as to avoid risk and to introduce a fatal ambiguity into its proposal. We will address all of Cubic's theories on their merits, or lack thereof. We also will discuss the consequences of a party raising a new legal theory at oral argument, not previously briefed and without notice to the other parties.

*"Discussions"*

 The FAR demands that a procuring agency not engage in conduct that favors one offeror over another. FAR § 15.306(e). To the extent Cubic complains of unequal treatment because Metric was permitted to revise its proposal, the Court finds that neither party was prohibited from submitting revisions on its technical proposal. The Air Force merely discouraged technical revisions because "[d]iscussions regarding [URITS proposals] ha[d] been completed." AR 7731. Its letters state quite explicitly, "technical changes and revisions to the terms and conditions of the model contract are neither expected nor encouraged." *Id.* There is nothing prohibitory in the language.

The close of discussions means that any misunderstandings or ambiguities in technical submissions will go uncorrected. In other words, a party making revisions cannot assume it will have a later opportunity to clarify or explain its last materials. *See Raytheon Co.*, B–261959.3, 96–1 CPD ¶ 37 (Jan. 23, 1996). The clause in the request for FPRs merely cautions offerors of this well-known fact.

But Cubic's complaint lies not so much in Metric's submission of the Israeli flight data or in the Air Force's receipt of it. The sin, according to Cubic, lies in the Air Force's consideration of the data without reopening discussions with Cubic. Therefore, we must decide whether the Air Force's consideration of the data is tantamount to "discussions" with Metric, conducted after the announcement that discussions had been closed.

Plaintiff underscores its claim of error by proffering that had it been permitted further discussions, it would have sweetened its proposal further by [offering a number of additional identified enhancements]. *See* Affidavit of Richard L. Dickson at ¶¶ 6–7, 9–10.

We observe, initially, that in its letter soliciting FPRs from Cubic, the Air Force invited the plaintiff to submit capabilities it had earlier promised to add—[two previously identified enhancements]—and Cubic did so. AR 4000B, 4123–24, 756–77. No similar reminder was included in the letter to Metric, though it is not hard to imagine the Air Force sending one. Metric had promised to supply the Israeli flight data during the analysis of the December flight demonstration. Although we do not rest on the point, the "equalization" of reminders accentuates the anomaly in Cubic's argument. Cubic never satisfactorily explained why the submission and consideration of the Israeli flight data constituted a "discussion," but the submission and consideration of the additional Cubic capabilities did not amount to a balancing "discussion" by the same analysis.

We find that the submission by Metric and consideration by the Air Force of the Israeli flight data do not constitute "discussions." The ordinary dictionary meaning of the word connotes a discourse, a reasoned conversation, the exchange of pros and cons to reach the truth of a matter. What Cubic cites as a "discussion" is more accurately a monologue, with the Air Force listening but not responding. The vocal equivalent of one hand clapping.

The FAR's definition also clearly comprehends the element of mutual exchange between the government and the offeror:

> Negotiations are exchanges ... between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract or other terms of a proposed contract. *When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.*

FAR § 15.306(d) (emphasis added).

Clearly, under the regulation all contacts between government and bidder are not "discussions." Metric's submission of data that had been previously addressed and anticipated by the Air Force, without requests for further clarification by the Air Force, lacks the element of exchange that is explicit in the FAR's treatment of "discussions." It certainly falls short of negotiation. The Air Force was under no obligation, as Cubic suggests, to reopen discussions with *either* offeror upon receipt of the Israeli flight data from Metric. And it did not.

In stating that technical changes were not encouraged, the Air Force warned that any new data could jeopardize the award of the contract if last minute inconsistencies were introduced. The Air Force did not retreat from its position, and although Metric's risk assessment did not suffer because of the late data, it also did not improve. According to the Air Force, the risk in Metric's proposal performing as proposed remained "moderate," though one might well have expected it to improve to "low."

We therefore conclude that the submission and consideration of the Israeli flight data did not constitute a unilateral discussion with Metric, and that the Air Force treated the offerors equally.

Having found no error, it is certainly unnecessary that we consider whether there was prejudicial error. However, we note that Cubic has cited a number of additional enhancements and improvements it would have or might have offered in further discussions and a new round of FPRs, including perhaps a revised price. Still, there being no unequal treatment, no *ex parte* discussions, and no indication that but for the erroneous consideration of the Israeli flight data, there was a "substantial chance" Cubic would have been awarded the contract, plaintiff has failed to carry its motion. *Alfa Laval,* 175 F.3d at 1367.

*"Risk Avoidance" and "Fatal Ambiguity"*

Cubic's second and third independent theories challenging the Israeli flight data we

have termed "risk avoidance" and "fatal ambiguity." The theories were not raised in either complaint, nor briefed in Cubic's moving or responding papers. No notice of the theories was provided the other parties or the Court—not even the courtesy of an informal phone call to alert the parties of Cubic's new arguments and authorities.

After these theories were argued at the hearing on summary judgment motions, Cubic was directed to provide citations to its prior pleadings demonstrating that these theories had been briefed. Both parties were also directed to provide legal memoranda on the effect of plaintiff's reliance in argument on legal theories not previously briefed in its written submissions.

Cubic concedes that it did not previously brief the theory that submission of the Israeli flight data created a fatal ambiguity in Metric's proposal. This theory, it claims, was not advanced previously because it first surfaced in the deposition of Mr. John Provine, the chief of the technical evaluation team for URITS, when he stated that the Israeli flight data was part of the Metric FPR submittal. Cubic attempts to put its remarks during the oral argument in context: "having just been surprised by Mr. Provine's views ... *if* the Air Force were to try to argue that the Israeli flight data *was* within Metric's FPR, then the Court would have to consider whether Metric's FPR was ambiguous ...". Pl. Supp. Br. at 5.

Mr. Provine was deposed on August 31, 1999. During the period from August 31, 1999, up to and including oral argument on September 21, 1999, Cubic never made a motion, formal or informal, to amend further its pleadings or written briefs to include the theory. Moreover, at the time of oral argument, Cubic had for five months possessed Metric's cover letter and the Israeli flight data, which are allegedly in conflict and create the complained of ambiguity.

As for its "fencing off" or "risk avoidance" theory, Cubic maintains the theory was fairly raised in its prior pleadings. It contends "[t]hroughout these briefings Cubic repeatedly has emphasized that Metric took deliberate steps to separate its submittal of the Israeli flight data from its revisions to its

final proposal." Pl. Supp. Br. at 2. Indeed, plaintiff's briefs contain copious references to Metric's actions, its motive and intent. But never once did Cubic suggest that prejudice resulted from the possibility that Metric's data would be insulated from risk of error when considered by the Air Force. The focal point of Cubic's complaint has always been that the submittal unfairly allowed Metric to continue discussions after discussions were closed to Cubic.

Were the Court to strain enough perhaps it could make Cubic's new theory fit into the broad category of "unequal treatment," but only in hindsight, and even then the theory appears tangentially related at best. This does not help the other parties, however. The government and Metric were not given the opportunity to respond to these arguments in their briefs nor to prepare for them at oral argument.

The government and Metric, citing an approach adopted in other Circuits, have suggested that the Court view plaintiff's argument of new theories as a motion for leave to amend its pleadings, and then promptly deny the motion based upon the prejudice to the parties and the futility of the new arguments pressed. We certainly agree that the government and Metric are prejudiced by plaintiff's twelfth-hour arguments. But Cubic, we note, has never sought to legitimize its actions in such a manner.

With the advent of "notice pleading," the *Federal Rules of Civil Procedure* (Fed. R.Civ.P. *or* Federal Rules), upon which the RCFC are based, simplified rules of pleading. The Rules dispensed with technical pleading requirements in order to secure the just, speedy, and inexpensive determination of actions. Fed.R.Civ.P. 1. The discovery process and submission of motions and legal memoranda supply the specificity no longer required in initial pleadings. But Cubic has failed to put other parties and the Court on notice of its new theories via any of these means. This does not aid the Court in determining its motion in a just, speedy or inexpensive manner.

Like its counterpart in the Federal Rules, RCFC 7(b) requires a moving party to speci-

fy "with particularity" the grounds upon which relief is sought. RCFC 7(b); *see also* Fed.R.Civ.P. 7(b). Since this Court's rules on motions practice are based upon the Federal Rules, we can rely on cases and authority interpreting those Rules. *PCL Constr.*, 41 Fed.Cl. at 248 n. 5; *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70, 1989 WL 53389 (1989). A motion for summary judgement is made with particularity "when it *state[s] the theory on which the movant was proceeding*, list[s] pleadings and papers upon which the movant relie[s] and state[s] the motion was made pursuant to Rule 56 authorizing summary judgment." 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Civil 2d § 1192 n. 1 (West 1990)(citing *United States v. Krasnov*, 143 F.Supp. 184 (E.D.Pa.1956), *aff'd*, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957))(emphasis added).

The particularity requirement is not a mere technicality. It is "real and substantial." *Id.* If the motion language is general, the requirement can be satisfied when the supporting briefs specify the grounds with particularity, diminishing any prejudice due to lack of notice. *See generally*, 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 7.03(4)(a) (3d ed.1999), and cases cited therein. Here, the misleading nature of the "supporting" briefs are the root of the problem, not the cure. Faced with Cubic's "risk avoidance" and "fatal ambiguity" theories for the first time at oral argument, the government and Metric were certainly never put on notice with particularity.

There is much common ground between appellate advocacy and summary judgment advocacy. Any experienced appellate litigator knows that issues not raised in a brief are waived. *Cf.* 16A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Juris.3d § 3974.1 n. 12 (West 1999) (Circuits construing Fed. R.App. P. 28 briefing requirements apply waiver to issues asserted at oral argument but not raised in initial brief). The core of that common ground lies in the unfairness resulting from arguing issues that have not been briefed.

Although this Court liberally allows oral argument on dispositive motions, in general both the entitlement to and scope of the argument is a matter within the Court's discretion. *Compare*, RCFC, App. H ("Oral argument ordinarily shall be heard on all contested motions") *and* Fed. R.App. P. 27(e)("A motion will be decided without oral argument unless the court orders otherwise.") There is clearly "no right to oral argument on a motion." Fed. R.App. P. 27 advisory committee's note. A court might in its discretion permit a new theory to be raised at oral argument, but it certainly need not. And if it did, it would have to allow the other side sufficient time to prepare and present a response.

We decline to undergo the legal gymnastics of characterizing Cubic's arguments as anything but "too late." We put no gloss on Cubic's actions. It conducted litigation by ambush, pure and simple, and not for the first time in this case. Accordingly, we find that plaintiff's "risk avoidance" and "fatal ambiguity" claims are out of order.

We disapprove of this kind of tactic and believe it negates the entire concept behind the modern system of civil litigation. Still, at the risk of seeming to condone Cubic's behavior, we discuss the arguments briefly, if for no other reason than to show how futile they are.

When Metric responded to the Air Force's Request for FPR, in a cover letter dated February 9, 1999, it stated:

In recognition of your guidance in the Request for Final Proposal Revisions, we have not included any changes to our technical proposal. However, we have included supplemental test data collected recently. Hopefully, this data will be enlightening.

AR 5907.

Upon these three seemingly straight-forward sentences, Cubic erects an edifice of artful deceit. In its view, Metric was offering a technical revision but disguising it as something else. The disguise was necessary, according to Cubic, because an ambiguous or misunderstood technical revision would necessarily go unexplained after the close of discussions. Cubic alleges that this submittal was merely a ploy by Metric to persuade

the Air Force that its technical problems were solved, while "fencing itself off" from the risk that its data was in error.

Cubic offers no evidence to support its assertion that this was Metric's dark motive. That interpretation is entirely its own paranoid-like creation. We understand the three Metric sentences as having no more than their plain meaning: Metric is not changing the technical aspects of its proposal, but is simply submitting data which backs up that proposal, its previously promised Israeli flight data. This was nothing more than another installment of the kind of information the RFP had requested to support technical proposals. *See* AR 934 ("Test reports, test results, *operational data*, and vendor data *that establishes the maturity of the proposed system and its components* shall be included," in demonstrating performance sub-factor in technical volume of proposal.) (emphasis added).

We would think Cubic would follow up on this theory and next show that the Air Force was actually deceived. In fact, at argument the Court requested the parties to address in supplemental briefs whether Metric's subjective motive and its characterization of submissions were even relevant. Nothing in any of those later pleadings has attempted to establish that this "evidence" of subjective intent was relevant to the Air Force's or to the Court's decision-making. We are tasked with the administrative review of the decision maker, the agency and its personnel, not the participants' subjective intent.

As an adjunct to this "risk avoidance" theory, Cubic also argued that Metric's designation of the Israeli flight data in its cover letter was ambiguous as to whether it was an FPR. Although not so clear at the time, Cubic refined its position in the supplemental brief ordered by the Court. This was in direct contravention of the Court's instruction that Cubic *not* address the merits of its theories. Still, it now contended the so-called fatal ambiguity was created when Metric, in its cover letter, explicitly stated that it was not changing its proposal and then suggested that the data was part of the FPRs.

This ambiguity, Cubic argues, requires that Metric's entire proposal be rejected, cit-ing five cases, four of which had not been included in its written submissions. These cases involved situations where an offeror submitted information which clearly placed in doubt the offerors ability or intent to meet contract requirements. *See e.g., McAllister and Assoc., Inc.,* B–277029.2, 98–1 CPD ¶ 85 (Feb. 18, 1998); *Global Assoc., Ltd.,* B–271693, 96–2 CPD ¶ 100 (Aug. 2, 1996); *Tri–State Government Service, Inc.,* B–277315, 97–2 CPD ¶ 143 (Oct. 15, 1997); *Marylou's Trans. Serv.,* B–261695, 92–2 CPD ¶ 154 (Sept. 28, 1995). Of course, there has been no showing that Metric's Israeli flight data was information of this sort.

We do not see this ambiguity, nor do we believe that discussion of the proper label to place on the data advances the issue. We certainly do not think it comes anywhere near invalidating Metric's entire proposal, even if we agreed the proper designation was relevant. The name chosen for the submission had nothing to do with the substance of Metric's proposal and was in no way material to it. We repeat—it was simply what it was—22 pages of performance data which had been forecasted in its earlier discussions. Finally, we note that Cubic offered only a pallid argument for prejudice to support its "ambiguity" theory, and none at all for its "risk" theory.

\* \* \*

Under any Cubic theory, its first count is without merit. By its own admission, Cubic received substantially the same letter Metric received requesting FPR's. Like Metric, Cubic is a sophisticated government contractor. Cubic knew the risks inherent in adding revisions at the eleventh hour of a procurement. Like Metric, it submitted additional materials, albeit solicited, with its FPR's. Neither offeror participated in further "discussions" after submitting its FPR's.

### The Scoring of Cubic's Contractor Logistics Support (Count 2)

██ In the second count of the amended complaint Cubic takes aim at the agency's "Green–Acceptable" determination for its proposal for Contractor Logistics Support (CLS), the day-to-day operational support for

URITS. The PRAG recognized Cubic's [outstanding management characteristics] in certain identified prior contracts. AR 6227, 7510, 7908. In particular, technical evaluators for the procurement considered [one particular aspect] in Cubic's CLS proposal a "strength." AR 7526, 7924, 8220. Initially, no weaknesses were specifically identified regarding CLS, although other past performance issues were ultimately brought to the attention of the SSA, as we address in our discussion of Count 4. AR 6227, 7510.

The definition of a "strength," if such a definition were required, is "a significant, outstanding, or exceptional aspect of an offeror's proposal that exceeds the evaluation standard and provides a useful capability that will be included in the specification, or statement of objectives or statement of work, or is inherent in the offeror's process." *See* AFFARS at App. BB–103. Cubic's claim is simple. The Air Force identified certain strengths and did not identify weaknesses in Cubic's CLS. It follows that Cubic is entitled to the highest available rating for its CLS— "Blue—Exceptional" —and anything less would amount to an arbitrary and capricious decision by the agency.

The government counters that the identified strengths of Cubic's proposal went to isolated aspects of CLS, and did not translate directly to an overall strength. Apparently the Air Force was pleased with the prospect that Cubic intended to [provide a particular aspect of its management proposal]. AR 7924, 8220 1342, 1347–48. There is no doubt that a smooth transition would result from this [particular aspect of its management proposal]. However, as the government argues, the overall benefit to the Air Force was limited [in extent and duration]. AR 849, 935, 2924, 7526, 8220, 1347–48; Def. Br. at 27; Provine affidavit at ¶ 21.

Under the SSP, an offeror's proposal merits a "Blue–Exceptional" evaluation if the proposal exceeds specified performance or capability in a beneficial way to the Air Force, without significant proposal inadequacy. However, as the government and Metric point out, the strengths are identified by a technical evaluator reviewing the proposal from a narrow perspective. The ultimate evaluation of the proposal requires the independent judgment of the SSA, who must assess the proposal's overall benefit to the Air Force, a much broader context. *See Marine Hydraulics Int'l, Inc. v. United States,* 43 Fed.Cl. 664, 674–75 (1999)(SSA assigned "excellent" performance rating despite individual evaluations of "very good," and rejected award recommendation of "best value advisory commission").

The color scheme employed by the Air Force under the SSP is an internal mechanism to assist in scoring various portions of each offerors' proposal. Although we do not agree with the government's position that a bidder is not entitled to question the application of the color scheme, we find no error in the manner in which the Air Force scored Cubic's proposal.

On the other hand, had the Air Force applied the scheme in the manner plaintiff urges—"strength" equals "Blue," no further questions—indeed its decision might have been arbitrary. The facile logic of plaintiff's argument does not survive the scrutiny of common sense, and certainly not the deferential review of administrative decisions in bid protests. *See KBM Group, Inc.,* B–281919.2 *8–9 (May 3, 1999)(denying protest where procuring agency recognized as strength specific experience and program knowledge and identified no weaknesses, yet evaluated proposal as merely acceptable overall.) If the scoring system were as mechanical as Cubic argues, then how would one rate a CLS proposal that offered three times the extent and duration of Cubic's? If such a proposal warranted a Blue, would Cubic's also get a Blue? We think not.

There is no allegation by Cubic that the SSA failed to consider the CLS strengths— only that improper weight was given that aspect of its proposal. Cubic's "disagreement" with the SSA, however, does not supply grounds to reverse a reasoned decision on the relative merits of the proposals and the benefit provided to the Air Force.

This is not "color-by-the-numbers." It is government contracting in the vital area of national defense. We do not sacrifice qualitative analysis and the exercise of judgment

in favor of rigid quantitative results. *See TRW*, 98 F.3d at 1327–28 (SSA not bound by quantitative factors in best value competition). The fact that the Air Force utilizes a somewhat quantitative system here does not change our approach. For the system is merely a guide, an administrative convenience. *See Grey Advertising, Inc.*, B–184825, 55 Comp. Gen. 1111, 1976 WL 13172, *9 (May 14, 1976). Rather, we allow procuring agencies broad discretion, recognizing that a negotiated procurement such as this one is "inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for." *Delbert Wheeler*, 39 Fed.Cl. at 247 (quoting *Sperry Flight Sys. Div. v. United States*, 212 Ct.Cl. 329, 548 F.2d 915 (1977)).

The solicitation supports this rationale. The solicitation emphasizes that the use of a color-risk grading scheme is "conceptual, not numerical, in nature," and that the agency's "final decision is an integrated assessment of all of the evaluations, and is by very nature a subjective decision." AR 953.

Given the narrow focus of Cubic's CLS strengths, and the broad discretion exercised by the SSA in making this type of determination, the Court cannot conclude that the SSA's decision to give this factor a "Green—Acceptable" rating was without a rational basis. *Marine Hydraulics*, 43 Fed.Cl. at 678; *Baird Corp.*, 1 Cl.Ct. at 664. Furthermore, we observe that Cubic again does not address the discretionary aspect of this evaluation. It simply asserts that the failure to assign a Blue rating constitutes a number of legal sins, each of which amounts to reversible error. Its showing of prejudice consists of stating that it would have then had the same number of Greens and Blues as Metric, although not for the same factors.

### Consideration of Cubic's Past Performance (Count 4)

Cubic argues that by failing to identify two contracts that were considered in evaluating its past performance, the Air Force deprived it of the opportunity to respond to weaknesses noted in those contracts. Plaintiff contends that the omission

violates the Air Force's duty to conduct "meaningful discussions" with offerors.

The Air Force initially solicited from Cubic the information on prior contracts Cubic believed were relevant in assessing past performance for this particular procurement. Cubic nominated five contracts: Kadena Interim Training System (KITS), Joint STARS Ground Data Terminal (JSTARS), Nellis Air Combat Training System (NACTS), Korean ACMI O & M, and Egyptian ACMI O & M. During the first round of discussions, Cubic received ENs citing past performance problems in three areas: [first, second, and third aspects of contract management]. AR 6902–03. The Air Force EN's specifically identified three contracts exhibiting these problems: KITS, NACTS, and the Joint Readiness Training Center (JRTC) contracts. The last, JRTC, was not on Cubic's original list.

Although referencing specific contracts, the notices invited Cubic to provide clarification on the noted past performance risk *issues*. AR 6231. Cubic's responses failed to address aspects of [the first aspect of contract management], admitted responsibility for portions of [the second management deficiency], and noted recent initiatives, yet unproven, in the area of [the third deficiency contract management]. AR 7030–31. After considering Cubic's responses, the PRAG rated Cubic's performance risk as "moderate," identifying the three weaknesses. AR 6226, 6231, 6902–03, 7908, 8210.

When debriefing Cubic in February 1999, after the award to Metric, the Air Force briefing slides listed these weaknesses as a basis for its risk assessment. However, two other contracts, not named in prior ENs—the Additional Egyptian Display and Debriefing System (AEDDS) and the Multiple Integrated Laser Engagement System (MILES) 2000—were included on the slides for each of the three management weaknesses.

The Air Force admittedly never sent Cubic ENs citing the AEDDS or MILES contracts. However, the performance problems associated with both MILES 2000 and AEDDS were identical to those found on contracts that were cited in the ENs.

Before a competitive range is determined, the FAR requires that the agency afford an offeror the opportunity to address adverse past performance information on which the offeror has not previously had the opportunity to comment. FAR § 15.306(b)(4). After establishment of a competitive range, the FAR requires, in pertinent part:

> [t]he contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, *significant weaknesses, deficiencies, and other aspects of its proposal* (such as cost, price, technical approach, *past performance*, and terms and conditions) that could, *in the opinion of the contracting officer*, be altered or explained to enhance materially the proposal's potential for award. *The scope and extent of discussions are a matter of contracting officer judgment.*

FAR § 15.306(d)(3) (emphasis added). Likewise, the AFFARS provides that offerors must be advised of their proposal deficiencies during discussions. AFFARS at App. BB–312(b).

The question presented is whether Cubic was denied the opportunity to engage in meaningful discussions with evaluators on perceived management weaknesses. The government argues that the AEDDS and MILES 2000 contracts were of little relevance in assessing risk for Cubic's past performance. Cubic concedes, and the administrative record confirms, that the relevance of the AEDDS and MILES 2000 contracts visavis the URITS contract was moderate, while other past contracts such as NACTS and KITS were considered highly relevant. Nonetheless, the government's argument does not carry the day. The contracts were cited in the post-award debriefing. We assume military departments do not include superfluous facts in their briefings.

The government too swiftly moves to a defensive posture. It does not give adequate attention to the Air Force's obligation to conduct "meaningful discussions" and whether Cubic had the opportunity to comment on the deficiencies. The FAR's treatment of discussions speaks in broad terms of subject matter areas. *See* FAR § 15.306(d)(3) ("significant weaknesses, deficiencies and other

aspects of its ... past performance"). Clearly, the obligation goes to the issues, not the specific circumstances that illustrate those issues. The Air Force satisfied its obligation by citing the three management weaknesses. It was not obligated to cite all the illustrative contracts. *See Voices R Us*, B–274802.2, 97–2 CPD ¶ 170, 1997 WL 789005 *2–3 (Dec. 24, 1997)(Navy discharged discussions obligation where it identified *categories* of past performance problems that related to specific problems found in past performance surveys).

Cubic was placed on notice of significant identified management problems. That renders the discussions "meaningful" under the FAR. *See Pacific Architects & Engineers, Inc.*, B–274405.2, 97–1 CPD ¶ 42, 1996 WL 768799 *3 (Dec. 18, 1996) (although protester not provided opportunity to comment on every performance survey response, Army's identification of categories in which past performance was deficient "imparted sufficient information to afford the offeror a fair and reasonable opportunity to respond to the problems identified"); *Du & Assoc., Inc.*, B–280283.3, 98–2 CPD ¶ 156, 1998 WL 892043, *6 (December 22, 1998) (discussions meaningful where protester led into area of agency's concern); *Volmar Constr., Inc.* B–270364.2, 96–1 CPD ¶ 139, 1996 WL 97478, *3 (all-encompassing discussions not required).

The scope and extent of discussions is, of course, a matter of contracting officer discretion. FAR § 15.306(d)(3); *Miller–Holzwarth v. United States*, 42 Fed.Cl. 643, 655 (1999). In exercising this discretion, the contracting officer "was not required to engage in discussions with [Cubic] regarding issues which [she] reasonably found needed no further clarification." *Cincom Sys.*, 37 Fed.Cl. at 675. The Court fails to find a significant departure from the scope of her discretion.

Cubic had the opportunity to defend its record on the identified weaknesses, and did so poorly. It was free to show the Air Force that it had solved these management problems in the administration of those contracts, or had taken steps to remedy the deficiencies in future contracts. It was equally free to bring to the Air Force's attention that it had solved those very same problems in two addi-

tional contracts, the AEDDS and MILES 2000, if indeed it had.

Cubic makes a great show of citing the evidence it would have presented had it known these two contracts had been considered. In *post-hoc* affidavits, Cubic claims it would have submitted a favorable CPAR on the MILES 2000 contract, while the government counters that the CPAR's "acceptable" rating is overshadowed by unflattering narrative. *Compare* Affidavit of Stacey L. Hughes (Contracting Officer), dated July 7, 1999, *and* Affidavit of Richard L. Dickson, *supra.*

We are unimpressed. Even under the most generous reading of the proffered evidence, the materials related to the two additional contracts are not strongly favorable to Cubic. Besides, self-interest of an even modestly competent bidder requires that it give the Air Force evaluators everything positive that will aid its chances in the competition.

We doubt such a bidder takes the passive attitude Cubic suggests in its papers, and we would be very surprised if Cubic, an experienced defense contractor, would be so reactive in connection with such an important contract. The administrative record lists numerous recent defense contracts awarded to Cubic as part of the Air Force's past performance inquiry. Although we do not rely on the point in this procedural setting, there is no gainsaying that Cubic has been through this exercise many times before. Cubic had to be well aware that the Air Force in evaluating past performance was not limited to the five contracts the bidder nominates; the RFP clearly stated that the agency would also consider "information the government may obtain elsewhere". AR 940. We have noted that the EN Cubic received also named the JRTC contract—not one nominated by Cubic—as evidence of one of the management weaknesses, putting Cubic on notice, if it needed any, that the Air Force was indeed reviewing other contracts. We can presume that Cubic was well aware of its own contract performance history and we are confident it offered all the positive evidence it believed would persuade the Air Force. However, for purposes of the motions before us, we give Cubic the benefit of the doubt.

Even with all inferences resolved in favor of Cubic, the outcome is unchanged—whether oversight or calculated, its failure to raise the AEDDS and MILES contracts on its own initiative did not make the "discussion" of past performance less than meaningful.

Altogether separate from the question of regulatory compliance is the question of prejudice. Disregarding the MILES 2000 and AEDDS contracts for the moment, Cubic was unable to rebut persuasively deficiencies in those past contracts of which it *did* have notice. Even had Cubic responded positively to weaknesses in the MILES 2000 and AEDDS contracts, it cannot demonstrate that it would have materially enhanced its overall past performance record. *See Pacific Architects*, B–274405.2, 97–1 CPD ¶ 42, 1996 WL 768799, *3 (Dec. 18, 1996)(protest rejected where offeror failed to identify any basis for which its proposal was downgraded for past performance which did not fall within one or more of the problem categories called to its attention during discussions); *see also, Black & Veatch Special Projects Corp.*, B–279492.2, 98–1 CPD ¶ 173, 1998 WL 339687, *6 (June 26, 1998)(finding violation of FAR requirement to provide opportunity to address negative past performance information, but concluding protestor would not have had a reasonable possibility of receiving award but for agency's failure to discuss references).

In fact, Cubic made only the most perfunctory of efforts to show prejudice, stating in as many words that the Air Force conduct violated applicable procurement regulations, and that therefore the evaluation was arbitrary and capricious. Although this Court has recognized that such violations may form the basis for recovery, it is equally plain that not all statutory or regulatory violations warrant relief—the protester must demonstrate a "clear and prejudicial" violation. *Hydro Engineering*, 37 Fed.Cl. at 473 (citing *Central Arkansas Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995)).

As detailed above in the discussion of the legitimate exercise of the contracting officer's discretion, the Court finds no "clear" regulatory violation. Any violation is certainly not "prejudicial," given Cubic's failure to resolve

or rebut identical deficiencies noted in other contracts. Therefore, having resolved all inferences respecting the AEDDS and MILES 2000 in the light most favorable to Cubic, the Court finds that Cubic cannot demonstrate that its performance risk assessment might have been better. Nor can Cubic show, even assuming a better risk assessment, the SSA's decision to award the contract to Metric might have been different, especially since past performance was, by the terms of the solicitation, the least important of the three proposal factors evaluated.

Even a significant error in the procurement process does not entitle protestor to relief absent a showing that the error prejudiced the protestor. *See Candle Corp. v. United States,* 40 Fed.Cl. 658, 665 (1998)(citing *Statistica,* 102 F.3d at 1581); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). Accordingly, had we found the requirements of the FAR were not met, we would be hard-pressed to find prejudice based on this allegation of error. Cubic again cannot demonstrate that "that there was a substantial chance it would have received the contract award but for th[e] error." *Alfa Laval,* 175 F.3d at 1367.

### A Further Word on Prejudice

We have found in each instance that Cubic has failed to establish error. Cubic cannot show in any of its five counts a "clear and prejudicial" violation of procurement laws and regulations. *Central Arkansas Maint.,* 68 F.3d at 1342; *CACI Field Services, Inc. v. United States,* 854 F.2d 464, 466 (1988) (citations omitted). Moreover, Cubic cannot prove that the procurement decisions made here were arbitrary and capricious, especially considering the broad deference accorded the Air Force judgments in these circumstances.

Plaintiff's arguments overlook the important fact that the URITS procurement was a best-value competition involving advanced technology. The Court is especially wary of substituting its judgment for that of the agency officials in determining which proposals meet this important yet subjective criterion. *TRW,* 98 F.3d at 1327–28; *E.W. Bliss,* 77 F.3d at 449. Although in its initial complaint Cubic took issue with the estimated cost of Metric's proposal and Metric's ability to satisfy technical requirements, these challenges are notably absent from its amended complaint. Cubic concedes that Metric was able to fulfill the requirements of the solicitation at a substantially lower cost than Cubic.

If several million dollars in savings were not enough, Metric's proposal was the better technical option as well. True, the SSA determined that Metric's proposal entailed more risk than that of Cubic with regard to the "performance" sub-factor of the technical proposal. Yet Metric's Blue technical rating was higher than Cubic's Green. The SSA determined that Metric's superior technical proposal, costing $36,985,000, represented a better value to the Air Force than Cubic's bid of $44,879,000. We observe, if only in passing, that the SSA possessed substantial expertise and "corporate program knowledge" as a result of his involvement in prior acquisitions of air combat training systems similar to URITS. This is not the kind of decision courts can challenge, certainly not in the context of this case. *See Hydro Engineering,* 37 Fed.Cl. at 467.

Essentially, Cubic disagrees with the discretionary SSA determination. Abandoning its initial attempt to attack the award decision directly, plaintiff's ultimate five issues, out of a total of ten tries, have attempted to chisel away at various aspects of the procurement. In each instance, Cubic has failed to establish error and failed to show prejudice; indeed, for many it did not seriously try to show prejudice. Collectively, the resulting rubble does not amount to legal prejudice.

### Injunctive Relief

Establishing legal and prejudicial error sufficient to call into question the legality of the procurement does not automatically translate into injunctive relief. The Court has a variety of remedies available, including directions to re-start the procurement with corrective steps, payment of plaintiff's procurement costs, or at the extreme end, injunctive relief replacing the awardee with the challenger. Plaintiff has requested the entire spectrum of relief.

Cubic seeks a permanent injunction withdrawing the award to Metric and, as the only other offeror in this procurement, awarding the contract to itself. In order to obtain a permanent injunction, plaintiff must establish, by clear and convincing evidence, each of the following: (1) actual success on the merits; (2) that plaintiff will suffer irreparable harm; (3) that the harm suffered by plaintiff if injunctive relief is not granted will outweigh the harm to the government and third parties if the relief is granted; and (4) that granting the injunction serves the public interest. *Sofamor Danek Group, Inc. v. DePuy–Motech,* Inc., 74 F.3d 1216, 1219 (Fed. Cir.1996); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997); *Northern Telecom, Inc., v. United States,* 8 Cl.Ct. 376, 379 (1985).

If Cubic has faltered in carrying its burden of demonstrating ordinary prejudice, it has utterly failed to make the greater showing required before this Court grants the extraordinary remedy of injunctive relief. Cubic has asked the Court to dismantle a combat training system already up and running in an important theater of operations. We would expect a party so moving to justify this remedy in any case and most assuredly in this case.

When we say that Cubic has failed to make its case, we do not mean only that it has failed to carry its burden or that it has not been persuasive. Cubic's papers totally omit any discussion of the relevant standards for granting injunctive relief, and do not even attempt a showing that it is entitled to this relief. Its papers simply stand mute. In its supplemental filing, it seems to take the position that establishing error leads inexorably and automatically to the granting of its claimed relief.

It is not just its own "irreparable harm" that Cubic has neglected to demonstrate. It has also failed to demonstrate that the harm it would suffer without injunctive relief outweighs any harm to the government or Metric. Furthermore, it has not attempted to show this Court that granting the injunction serves the public interest.

When asked about this omission, Cubic's supplemental brief referred the Court to its complaints, where it made bare assertions that it deserved relief. Plaintiff's complaint alleged that the public interest is served in maintaining the integrity of the procurement system and preventing performance by a contractor not in compliance with the URITS solicitation. Any delay accompanying an injunction, Cubic then asserted, will be "insignificant" in comparison to the five-year potential term of the contract. Cubic seems to think that allegations in a complaint suffice to establish its case and carry its burden. Counsel knows better.

Counsel also knows that much has changed in the long months since the initial complaint, filed a month after award. Cubic has been responsible for a leisurely litigation schedule, aggravated by unnecessary delays it engineered. Cubic began this case by abandoning without a murmur its plea for temporary relief; fittingly, it ends its case by abandoning without a murmur its plea for permanent relief.

The contract at issue is not a procurement for grounds maintenance at an Air Force base. URITS is to serve as the primary means of maintaining "readiness" as respects the combat skills of our pilots in USAFE, a war-fighting command. During the pendency of the litigation, that command was indeed committed to combat in a military operation deemed essential by the President, the North American Treaty Organization, and the United Nations. We do not need the statutory reminder in 28 U.S.C. § 1491(b)(3) to "give due regard to the interests of national defense and national security. . . ." Plaintiff's generic allegations of the elements for injunctive relief, pled but not shown, do not answer.

Cubic also did not make a case for lesser relief, such as recovering its procurement costs. Not every irregularity gives rise to the right to be compensated for the expense of undertaking the bidding process. *Keco Indust.,* 492 F.2d at 1203.

The costs of this litigation are another matter. From the very start, the Court has wondered at plaintiff's litigation tactics. It is no closer to an answer than it was last March. It is, however, most concerned that

Cubic's conduct during the prosecution of the case may have imposed unnecessary time and expense on Metric and the government.

### *CONCLUSION*

Plaintiff's allegations of error are without merit, and do not support plaintiff's claim for relief. Based upon the administrative record, the Court concludes that the challenged actions and decisions of the Air Force were neither arbitrary, capricious, an abuse of discretion, nor otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see* 28 U.S.C. § 1491(b)(4).

Accordingly, defendant and intervenor are entitled to judgment as a matter of law. The Clerk of the Court is directed to enter judgment for defendant and intervenor, and dismiss the Amended Complaint.

IT IS SO ORDERED.